## COUNTY-SEAT OF OSAGE COUNTY.

1. COUNTY-SEAT ELECTION; *Second Election; Restriction to Two Places; Votes Rejected.* At an election held for the purpose of relocating the county-seat of Osage county, Burlingame, the existing county-seat, received no votes; Lyndon received 888; Osage City 791, and Shireton 785 votes. No place having received a majority, a second election was ordered, as prescribed by the statute, and the voting restricted to the two places receiving the highest votes, Lyndon and Osage City. At the second election, notwithstanding such restriction, votes were cast for Shireton, and the result was, that Lyndon received 1131, Osage City 1049, and Shireton 298 votes. Though Lyndon did not then receive a majority of the votes cast, the commissioners rejected the votes for Shireton, and declared Lyndon the duly and legally-selected county-seat: *Held,* that there was no error in such ruling and decision.

2. CONSENT OF ELECTORS, *To a Change of County-Seat; Mode of Selection.* While the constitution forbids a change of the county-seat without the consent of a majority of the electors of the county, yet there is no constitutional restriction upon the power of the legislature, after such consent has been given, to either make the selection of a new county-seat itself, or provide for the manner of its selection by the electors.

3. ———— *What is Consent.* Where at the first election a majority of the votes are cast in favor of places other than the existing county-seat, such majority is, within the meaning of the constitutional provision cited, to be deemed to have consented to a change.

## *Error from Osage District Court.*

AT an election held in Osage county May 25th 1875 for a relocation of the county-seat, three places were voted for, but no place received a majority. A second election was held on the 8th of June, to decide between Lyndon and Osage City, they being the two highest at the first election. At this second election Lyndon received 1131 votes, Osage City 1049, and Shireton 298 — total, 2478. On canvassing the vote, the county commissioners rejected the 298 votes cast for Shireton, and determined that Lyndon had received a majority of all the votes cast, and was chosen the county-seat. This canvass took place on the 12th of June, and thereupon two

of the county officers, John S. Edie, sheriff, and Thomas Donnell, clerk of the district court, removed their offices, and the records and papers thereof, from Burlingame to Lyndon, and the other county officers declared their purpose to so remove at an early day. On the 18th of June, *H. D. Shepard*, a citizen, elector, and taxpayer of Burlingame, commenced eight separate actions, two of them in the name of *The State*, (Shepard as relator,) to compel the sheriff and the clerk of the district court by mandamus to remove their offices, etc., from Lyndon to Burlingame, and the other six to restrain and perpetually enjoin the other county officers, *T. L. Marshall* as county treasurer, H. A. Billings, probate judge, J. G. Erwin, county attorney, Wm. Y. Drew, county clerk, E. Mills, register of deeds, and the board of county commissioners, from removing their respective offices from Burlingame to Lyndon. Alternate writs of mandamus, and temporary injunctions, were granted and issued. The sheriff and clerk of the district court showed cause. The other defendants demurred to the plaintiff's petitions. All the actions were heard at an adjourned term of the district court held on the 5th of July 1875. The district court found, as a conclusion of fact, that "the city of Lyndon is the county-seat of said Osage county," and refused peremptory writs of mandamus in the two cases, and dissolved the temporary injunctions in the other six, and gave judgment against *Shepard* for costs in each action. And from such judgments *Shepard* appeals, and brings each of said actions here by petition in error. The actions were all heard together in this court. Only one opinion was filed, and this in the case of *Shepard* against *Marshall*, treasurer, etc.

[In addition to the questions considered and decided by the court in the opinion, *infra*, counsel for *Shepard*, plaintiff in error, raised the same questions in regard to the validity of the petition praying for a relocation of the county-seat, the mode of ascertaining the whole number of electors of the county, and the registration-lists authorized by ch. 86, Gen.

20—16 KAS.

Stat., as those considered and decided in the *Linn County County-Seat* case, 15 Kas. 500.]

*Lewis & Thomson*, for plaintiff in error.

*Ruggles & Sterry*, for defendants in error.

The opinion of the court was delivered by

BREWER, J.: The facts in the case at bar, material to the proper understanding of the points to be decided, and the argument thereof, are as follows: For five years prior to June 8th 1875, Burlingame had been the county-seat of Osage county. In pursuance of an order of the board of county commissioners of said county, based upon a petition of three-fifths of the legal electors of the county praying for an election for the relocation of the county-seat of said county, an election was duly and legally held in said county on that subject on May 25th, 1875, at which election 2464 votes were cast, of which Lyndon received 888, Osage City received 791, and Shireton received 785. *Burlingame received no votes.* The vote was duly canvassed, and the result proclaimed that no place had received a majority of the votes cast, and that Lyndon and Osage City, having received the highest number of votes cast, they were the candidates and the only candidates for the county-seat of said county at a second election to be held on June 8th, 1875. On said June 8th, being the second Tuesday following said canvass, the second election was held. On the Saturday following, the vote of that election was duly canvassed, and such canvass disclosed that Lyndon had received 1131 votes; that Osage City had received 1049 votes, and said Shireton had received 298 votes; and therefore said board of county commissioners proclaimed the result, and declared Lyndon to be the county-seat of Osage county.

It is not disputed that these proceedings were in strict conformity to the statute, and the declared result warranted by its terms. Ch. 26 of the Gen. Stat., the act providing for

the location and removal of county-seats, in its 7th section

**1. At second election, vote is restricted to two places.** reads: "If no place receives a majority of all the votes cast, a second election shall be held, * * * and at such election the balloting shall be confined to the two places having received the highest number of votes at the preceding election." But the specific objection is, that such a result thus obtained involves a disregard of § 1 of article 9 of the constitution, which declares that "no county-seat shall be changed without the consent of a majority of the electors of the county." A majority of the electors have never, it is said, consented to a change from Burlingame to Lyndon; for, whether to be treated as blank votes or not, the 298 votes cast for Shireton are witnesses to the existence of 298 electors. A vote cast is evidence of the existence of an elector casting it; and here it is unchallenged evidence. It stands as proof of the fact, and the court cannot say that a majority of the electors have consented to the change. To this it is replied, that the original petition signed by three-fifths of the legal electors shows the consent to a change, and this satisfies the constitutional provision; that if this is not so, both elections (in neither of which did Burlingame receive a single vote) establish the consent, not merely of a *majority*, but of *all the electors*, to a change. It is said that the vote signifies two things, first a willingness, a desire to change from Burlingame, and second, a preference for the place voted for; that in this way the unanimous wish was for *a change from Burlingame,* and the only matter of difference was as to the place to which the change should be made. The question is asked, might not the legislature submit to the electors the simple question, Are you in favor of a change of the county-seat? and if a majority answered in the affirmative, itself select the new county-seat. The constitutional provision is not the grant of a power, but a restriction upon a power already vested in the legislature. It does not require a vote, nor an election. It does not declare how the consent shall be evidenced. It does not necessitate any selection of the new county-seat by the electors. It simply forbids a change

without their consent; and whenever that consent is secured, all other matters are within the legislative control. On the other hand it is said, that the vote is to be taken as a single act; that there is no direct decision upon the simple question of making a change; that the consent implied by a vote for another place is purely conditional, that is, that the voter consents to the removal from Burlingame, provided, and only provided, it is changed to the place he has voted for. So, that while 1131 electors have signified their consent to a change from Burlingame to Lyndon, 1347 have not only failed to consent to such change, but have actually expressed their disapproval thereof. So also, the question is not to be taken as a consent to the change, but simply as an expression of a desire to ascertain the sentiment of the county. For, where the question of a change in the county-seat has not been presented for some time, and changes have taken place in the population, even a resident of the old county-seat, and one desiring it to there remain, might well seek an expression of the sentiment of the people, to determine not merely as to the expediency of erecting new county buildings, but also as to his own investments and business operations. At any rate, it is said the simple question of consent to a change has never been submitted to the electors; that the change has never been approved by a majority of the electors, and that it is unjust to infer consent from an act or a vote which not only does not necessarily mean consent, but is even consistent with an entire disapproval of the proposed change. It cannot be doubted that there is great force in the arguments presented on either side, and that it is difficult to determine to which the decision must go. A majority of the court are of opinion that the weight of the argument is in favor of sustaining the election — that thus effect is given to the statute, and at the same time the constitutional restriction is respected. Full power is with the legislature in respect to the change of the county-seat, except as thus restricted. If in any way a majority of the electors express their consent to a change, then the selection of a new

*2. Consent of electors to a change.*

*Mode of selection.*

county-seat, or the manner of its selection, is within the power of the legislature. Given, the consent to a change, and the legislature may name the new county-seat, or it may remit the choice to the electors and provide the proceedings by which that choice shall be made. When the entire body of the electors upon the question of relocating the county-seat name as their choice for such county-seat other places than the prior county-seat, is it not an expression of their *desire for* as well as *consent to* a change? They divide upon the choice of a new, but agree in a desire to abandon the old. They prefer that it should be located elsewhere than it now is. They consent that it be changed. The law seems to have been framed upon the theory that one question at least shall be determined by each election. If on the first election no place receives a majority of all the votes, the law respecting the constitutional restriction declares that while no new county-seat has been selected, yet as a majority have named some place other than the old county-seat, that ma-

3. What is consent.

jority have expressed their consent to a change. For, if that majority were unwilling to change, the naming by them of the old county-seat would have been a clear expression of that unwillingness. If they had so voted, that election would have been a finality, and the county-seat remained undisturbed. If a vote for the old county-seat expresses an unwillingness to change, does not a contrary vote express a contrary wish? So the legislature seems to have thought, and provided that, if no place receives a majority, or in other words that a majority prefer some place other than the existing county-seat, but disagree as to the place to be selected, then a second election shall be had; and, to compel a final determination without repeated elections, it has limited the choice to the two places receiving the highest votes at the first election. By this construction the law is sustained in its application to the facts of this case, and apparently to all cases that may arise under it, while full force is given to the constitutional restriction as a protection to the rights of the existing county-seat. No county-seat can be changed unless at one or the other election a ma-

jority of the electors express by their votes their consent to a change.

All other questions presented in this case necessary for its decision have we believe been decided in recent cases, and need not be noticed here.

The judgment of the district court will be affirmed.

The same judgment will be entered in the other seven cases brought by the same plaintiff in error, the same questions being involved in them.

VALENTINE, J., concurring.