[No. 3782.]

THE BOARD OF COUNTY COMMISSIONERS OF EAGLE COUNTY v. THE PEOPLE EX REL. LOVE.

1. COUNTY SEATS—REMOVAL—ELECTIONS—STATUTORY CONSTRUCTION.
Under Session Laws, 1891, page 117, providing for elections for removal of county seats, before a removal can be effected, where the county seat has not been permanently located a majority of all the legal votes upon the proposition must be in favor of some one place, and where it has been permanently located it requires two thirds of all the votes in favor of one place.

2. SAME—CONSTITUTIONAL LAW.
That part of the act of 1891 (Session Laws, 1891, page 117), providing for elections for removal of county seats, which limits the right to vote on the question to resident taxpayers of the county is in contravention of section 2, article 14 of the constitution which prescribes the qualification of electors to vote upon the question of removal of county seats and only limits the right to qualified electors who have resided in the county six months and in the election precinct ninety days next preceding such election.

*Error to the District Court of Eagle County.*

THIS application in the name of the people on the relation of John W. Love was made in the district court of Eagle county for a writ of mandamus to compel the board of county

commissioners of Eagle county to enter in its records an order directing the removal of the county seat of that county from Red Cliff to the town of Eagle.

To the alternative writ the board filed its answer to which relator interposed a demurrer, and the same was sustained by the district court, and judgment entered awarding the peremptory writ, commanding the respondent to remove the county seat as asked. To review this judgment is the object of the present writ of error sued out of this court by the board.

From the pleadings it appears that, under an act of the general assembly which is set out in the opinion, notice of an election to vote upon the proposition of changing the county seat of Eagle county was given and the election held at the regular general election in November, 1895. For public officers 1,056 votes were cast, and on the proposition of the removal of the county seat there were 714 votes, distributed as follows:

| | |
|---|---:|
| For Red Cliff, | 197 |
| " Gilman, | 1 |
| " Minturn, | 103 |
| " Berry's Ranch, | 1 |
| " Wolcott, | 12 |
| " Eagle, | 393 |
| " Basalt, | 2 |
| " McDonald, | 3 |
| Blank Ballots, | 2 |
| | 714 |

The board refused to cause the order to be entered on demand made therefor, and the object of this proceeding was to compel a performance of what is said to be a clear legal duty devolving upon it by the express terms of the statute upon that subject in which no discretion is given.

Mr. JAMES DILTS, Mr. CHARLES J. HUGETS, Jr., and Mr. BRANCH H. GILES, for plaintiff in error.

Mr. T. A. DICKSON, Mr. JOHN A. EWING and Mr. H. T. SALE, for defendant in error.

CHIEF JUSTICE CAMPBELL delivered the opinion of the court.

A number of errors have been assigned and argued by counsel, but in the view we take of the case it is necessary to determine only two of these, for our decision upon them makes the election held, void, and its declared result ineffectual, and necessitates a reversal of the judgment and a dismissal of the petition.

1. The statute on the subject of the removal of county seats, under which the election was held, reads as follows :

" Whenever the legal taxpayers of any county in this state are desirous of changing the county seat of the county in which they reside at any time upon petition being presented to the county commissioners of such county, signed by a majority of such taxpayers as shall appear by the last tax roll, it shall be the duty of such commissioners to require the county clerk, in giving the notice for the next county election, to notify the legal voters of said county to designate upon their ballots at said election, the place of their choice, and if upon canvassing the votes polled or given, it shall appear that any one place has a majority of all votes polled, such place shall be the county seat, and notice of any change thereby made shall be given as provided by law.  No person shall vote upon the question of the removal of a county seat unless he be a resident taxpayer of the county.  *Provided*, That not less than two thirds of all the legal votes cast shall be necessary to effect a removal of the county seat of any county in this state which may have been permanently located."  Sess. Laws, 1891, p. 117.

The county seat of Eagle county had been permanently located at the town of Red Cliff for a number of years prior to this election.  It is conceded, therefore, that to effect a removal under this statute not less than two thirds of all

the legal votes cast was necessary. Counsel, however, radically differ in their construction of this provision. For relator it is contended that if two thirds of all the legal votes cast, though cast for different places, are against the place where the county seat has been permanently located, the requirement is met. The respondent, on the contrary, maintains that, to effect a removal in such a case, two thirds of all the votes cast must be in favor of some one place other than the existing county seat, and that it is not sufficient that the votes cast in favor of different places other than the existing county seat aggregate two thirds of all the votes.

In support of relator's position is cited *County Seat of Osage County*, 16 Kan. 296. There the act upon the subject in section 6 provided that the place having received a majority of all the votes cast at an election should be proclaimed the county seat. If no place received a majority, then a second election must be held under section 7 of the act, which reads: "If no place receives a majority of all the votes cast, a second election shall be held, * * * and at such election the balloting shall be confined to the two places having received the highest number of votes at the preceding election."

Section 1 of article 9 of the Kansas constitution declared: "No county seat shall be changed without the consent of a majority of the electors of the county." An election was held under this act at which 2,464 votes were cast, of which Lyndon received 888, Osage City 791, and Shireton 735. Burlingame, which had been the county seat, received no votes. The result of the canvass was declared to be that no one of the places received a majority vote, and a second election was held, at which Lyndon received 1,131 votes, Osage City 1,049, and Shireton 298 votes; and thereupon the county commissioners declared Lyndon to be the county seat of the county.

It will be observed that at neither election did any one place receive a majority of all the votes, and at the second election the canvassers rejected those cast for Shireton, it not being one of the two having the highest number of votes

at the preceding election, and declared in favor of Lyndon, which received more than Osage City. The supreme court affirmed this act of the canvassers, and in the course of the opinion held, substantially, inasmuch. as it appeared at the first election that a majority of all the votes cast were in favor of some place other than the existing county seat, that was equivalent to expressing their consent to a change and hence satisfied the constitution; and as the act provided that if there was not an actual majority in favor of any one place at the first election another election must be held at which the voting must be limited to the two places receiving the highest number of votes at the first election, and at the second election one of these received a higher vote than the other, it was concluded that the law in question was sustained in its application to the facts of that case.

In the opinion by Mr. Justice Brewer it was said that there was great force in the argument on both sides, and that the question presented was difficult. We do not think the decision is applicable to this case. A comparison of our constitution and statute with the constitution and statute of Kansas, there construed, shows that they are materially different. In Kansas no restriction is imposed upon the legislature, except that a majority of the electors must give their consent to the change. Not that the majority vote for some one place, only that such proportion consent to a change from the old. The manner of obtaining that consent was exclusively within the power of the legislature, and when ascertained, the legislature itself might relocate the county seat wherever it saw fit. The Kansas act having provided if at an election the majority failed to designate some one place, though voting against the county seat, a second election must be had and the voting limited to the two places receiving the highest number of votes at the previous election; if one of these two places had more votes at the second election than the other, it must be proclaimed the county seat.

Not so do our constitution and statute provide. Section 2 of article 14 is as follows:

"The general assembly shall have no power to remove the county seat of any county, but the removal of county seats shall be provided for by general law, and no county seat shall be removed unless a majority of the qualified electors of the county voting on the proposition at a general election, vote therefor; and no such proposition shall be submitted oftener than once in four years, and no person shall vote on such proposition who shall not have resided in the county six months and in the election precinct ninety days next preceding such election."

Our statute, already quoted, evidently intended that a greater vote should be necessary to remove the county seat when it had been permanently located than was required where it was only temporarily established. In the latter case a majority for some one place must be obtained. But, if relator's position is correct, the logical conclusion is that where the county seat is permanently located it may be relocated in favor of another place receiving less than a majority of the legal votes cast.

To illustrate: Suppose A is the permanent county seat. At an election held to relocate it, 600 votes were cast; A receives 150; B 125; C 100; D 100; E 75; F 50. Two thirds of this total vote are 400, distributed among five places. According to relator, two thirds have voted in favor of removal, because they voted against the existing county seat, and B having received a plurality of the two thirds has won, although less than two thirds—indeed less than a majority of all the votes—were cast for B.

It will not do to say that in case of a permanent location there can be no change unless some one of the places having in the aggregate two thirds also receives a majority of all the votes cast, for this would be to interpolate a clause that is not in this part of the statute, which is already found in the prior clause governing in case of a temporary location. Such a construction, moreover, would render the proviso we are considering altogether unnecessary, as, if such a construction were to prevail, then the same proportion of votes must be had

to effect a removal, whether the existing location is permanent or only temporary, and we are not to presume the general assembly would add a meaningless clause.

We think the plain meaning of the act is that where the county seat has not been permanently located a majority of all the legal votes upon the proposition must be in favor of some one place ; and if it has been permanently established, it requires a two-thirds vote in favor of some one place before a removal can be effected.

2. But the judgment below is also wrong because of an unconstitutional provision of the act that affects the integrity of the election itself. It reads : " No person shall vote upon the question of the removal of a county seat unless he be a resident taxpayer of the county." At this election none but resident taxpayers were permitted to vote.

Section 2 of article 14, already quoted, relates to the removal of county seats. In the absence of any constitutional limitations the power of the general assembly over this subject would be plenary, and, except as limited by the constitution, its power is still complete. But there are certain limitations in this section, of which this court, in the case of *Alexander et al. v. People*, 7 Colo. 155, thus speaks :

" Looking into section 2, article 14 of the constitution, we note four principal limitations upon the power of the legislature over this subject:

"First. The power to remove a county seat without a vote of the people is taken away. ' Second. The minimum vote necessary to effect a removal is prescribed. Third. A minimun limit is fixed as to the number of years that must elapse between successive submission of the question. Fourth. The power of the legislature is limited as to the qualifications of the voters. "

Among other points then ruled was one that this section did not inhibit the general assembly from requiring a two-thirds vote for the removal.

While it may be true that the specific subject of qualifications of voters was not then directly before the court, the

meaning of the section was. However this may be, it is plain that "qualified electors" of the county were declared to be entitled to vote on the removal of the county seat, and whether a majority, or two thirds of the votes be required, it means in both cases the votes of qualified electors. Without any accompanying explanation or limitation the term "qualified electors" means those qualified to vote at elections for public officers. Anderson's Law Dictionary; Bouvier's Law Dictionary; *State v. Williams*, 5 Wis. 308; *City of Beardstown et al. v. City of Virginia*, 76 Ill. 34; *State v. Tuttle*, 53 Wis. 45.

By referring to section 1 of article 7 we find that every person over the age of twenty-one years possessing the following qualifications shall be entitled to vote at all elections:

"*First*. He shall be a citizen of the United States, or, not being a citizen of the United States, he shall have declared his intention, according to law, to become such citizen, not less than four months before he offers to vote.

"*Second*. He shall have resided in the state six months immediately preceding the election at which he offers to vote, and in the county, city, town, ward or precinct, such time as may be prescribed by law; *Provided*, that no person shall be denied the right to vote at any school district election, nor to hold any school district office, on account of sex."

Were there nothing further in section 2 of article 14 than the clause that qualified electors were entitled to vote at elections on removal of county seats, it would follow that those entitled to vote at elections for public officers might vote thereat; but this section goes further and imposes another restriction and limits the right to vote to such qualified electors as have resided in the county six months, and in the precinct ninety days, next preceding such election. This requirement, it will be observed, is different from that of the general election laws passed in pursuance of section 1 of article 7, which requires residence in the county only ninety days, and in the ward or precinct only ten days, immediately preceding the election at which the elector offers to vote. 1 Mills' Ann. Stats. sec. 1571; Gen. Stats. 1883, sec. 1150.

But we are cited to *Mayor. et al. v. Shattuck*, 19 Colo. 104, for the proposition that at an election of this character it is competent for the legislature to add to the qualifications of electors as prescribed in the constitution the additional requirements that they shall be resident taxpayers of the county.   In that case, wherein was construed an act of the general assembly providing for the annexation of contiguous towns and cities, it was held that the legislature might limit the right to vote on the question of the dissolution and annexation to such of the qualified electors of the town or city as had in the year next preceding paid a property tax therein. This decision was based upon the holding then made that the word "elections" in section 1 of article 7 was not used in its comprehensive sense, but meant only elections at which public officers were voted for.   That decision would be in point here were it not that in section 2 of article 14 of the constitution the qualifications of electors entitled to vote on the proposition of the removal of a county seat are therein prescribed.   That section confers the right of voting upon such qualified electors in the county as have resided in the county six months, and in the election precinct ninety days, next preceding such election, and it was not competent for the legislature to add to these qualifications.   In the opinion Mr. Justice Elliott differentiates the case which he was then considering from the case of *State v. Williams, supra,* where, as he said, the constitution itself expressly provided who should be entitled to vote at an election for the removal of the county seat, and he remarked that section 5 of article 11 of our constitution contained a similar provision in relation to voting for the creation of a debt for public buildings; and, in further illustration, he might have said, as we now do, that section 2 of article 14 of our constitution also declares who shall be entitled to vote at an election for the removal of county seats; and such being the case, there was an implied inhibition. upon the general assembly to add other, or different, qualifications.   *State ex rel. Allison v. Blake,* 57 N. J. Law, 6;  McCrary on Elections, §§ 17, 24;  Cooley's Const.

Lim. pp. 78, 753; 1 Beach on Pub. Corp. § 382; *People v. Canaday*, 73 N. C. 198; *State v. Williams, supra; State ex rel. v. Lean*, 9 Wis. 279; *State v. Tuttle, supra.*

Our conclusion upon these two propositions renders wholly unnecessary a consideration of any of the other numerous propositions, so elaborately argued by counsel upon both sides, concerning which we express no opinion. For the reasons given, however, the judgment of the district court must be reversed and the cause remanded with instructions to the district court to dismiss the petition at the costs of the relator.

*Reversed.*