STATE EX REL. LANG, RELATOR, *v.* FURNISH ET AL., COUNTY COMMISSIONERS, RESPONDENTS.

(No. 3,351.)

(Submitted June 23, 1913. Decided July 7, 1913.)

[134 Pac. 297.]

*Mandamus—New Counties—Exclusion of Territory—"Qualified Electors"—Quasi-judicial Duties of Commissioners—Withdrawal of Signatures—Burden of Proof—Petitions—Protests —Date of Filing.*

Words and Phrases—"Qualified Elector."
1. Unless otherwise indicated in the particular Act before a court for construction, the term "qualified elector" means one who possesses the qualifications prescribed by section 2, Article IX of the Constitution.

New Counties—Exclusion of Territory—Signers—"Qualified Electors"—Definition.
2. *Held,* under the rule declared in paragraph 1, *supra,* that by the expression "qualified electors," as used in section 2, Chapter 133, Laws of 1913, page 484, in the provision that a petition for the exclusion of territory from a proposed new county shall be signed by at least one-half of the qualified electors residing in such territory, such persons are meant who possess the necessary constitutional qualifications, and not electors whose names appear on the great register of voters.

Elections—Registration—Purpose of.
3. Registration is no part of the qualifications of an elector; it is merely a method of ascertaining who the qualified electors are, and thus to guard against abuses of the election franchise.

New Counties—Commissioners—*Quasi*-judicial Duties—Constitution.
4. The inquiry which the board of county commissioners is, by Chapter 133, Laws of 1913, page 484, required to make in ascertaining the number of qualified electors in territory sought to be excluded from a proposed new county, and whether at the time of the filing of the petition for exclusion, it contained the genuine signatures of one-half such

qualified electors, is *quasi*-judicial in character, and the exercise of its decisional faculty in this respect does not constitute an invasion of the constitutional provisions which lodge the judicial power of the state in its courts.

Same—Petitions for Exclusion of Territory—Evidence of Sufficiency.

5.   In determining whether a petition for the exclusion of territory from a county proposed to be created was signed by 50 per cent of the qualified electors therein, the board of county commissioners may resort to whatever competent evidence it has at hand, including the great register of voters.

Same—Petitions—Withdrawal of Signatures Permitted.

6.   In the absence of legislative expression to the contrary, signers of a petition may withdraw their names at any time before final action thereon; hence, the board of county commissioners erred in refusing to consider withdrawals from petitions theretofore filed asking the exclusion of certain territory from a proposed new county, such refusal being based upon the ground that the withdrawals of signatures, though filed before final action, had not been presented until after the date fixed for the hearing.

Same—Exclusion of Territory—Burden of Proof.

7.   The burden of establishing the number of qualified electors residing in territory sought to be excluded from a proposed new county is upon the petitioners seeking exclusion, not upon the proponents of the new county.

Same—Petitions—When not *Prima Facie* Evidence.

8.   Petitions seeking exclusion of territory from a proposed new county, unaccompanied by an affidavit to the effect that the signers are qualified electors resident in the particular territory, and constitute 50 per cent of such electors in it, may not be taken as *prima facie* evidence of such facts.

Same—Petitions—Date of Filing—When not to be Considered.

9.   Under the New Counties Act (Laws 1913, Chap. 133, p. 484) the matter of the creation of a new county must be determined on the case as made upon the date fixed for the hearing (save as it may be affected by subsequent withdrawals before final action taken—see paragraph 6, *supra*); therefore, protests against its creation or petitions for the exclusion of territory from within its proposed boundaries filed after the date fixed for the hearing may not be entertained by the board of county commissioners.

Original application for *mandamus* by the state, on relation of William Lang, against Robert Furnish and others, commissioners of Custer county. Peremptory writ granted.

*Messrs. Booth & Maiden, Mr. L. A. Conser,* and *Mr. P. C. Cornish,* for Relator, submitted a brief; *Mr. Edwin S. Booth* argued the cause orally.

*Messrs. Tisor & McKinnon,* for Respondents, submitted a brief; *Mr. Carl R. Tisor* argued the cause orally.

*Mr. Chas. S. Loud,* appearing in behalf of the signers of the Wibaux and Ismay petitions for the exclusion of territory from the proposed new county of Fallon, who by order of the district court had been made parties respondent, submitted a brief and argued the cause orally.

MR. JUSTICE SANNER delivered the opinion of the court.

On April 10, 1913, a petition in due form, with signatures apparently sufficient, was presented to the board of county commissioners of Custer county, praying for the creation of a new county, to be called Fallon county. The board thereupon fixed May 1, 1913, at 10 o'clock A. M., as the time for hearing the proof of the petitions and of any opponents thereto, and directed the requisite notice to be given. On May 1, the requisite notice having been given, the board met for the purpose of the hearing, but for cause adjourned the same to May 7. On May 7 the board reconvened and proceeded with the hearing and concluded the same on May 13, 1913, with findings to the effect: That the petition for the creation of Fallon county was sufficient in form, substance, and signatories; that counter-petitions had been filed on May 1, seeking the exclusion of territory from the proposed new county, which were sufficient in form, substance, and signatories to require such exclusion; that, after excluding such territory, the valuation of all the property within the proposed new county was brought below $3,000,000; and thereupon the board denied the petition and declined to call an election.

The entire proceeding was had under the provisions of Chapter 133, Session Laws of 1913, which we shall call the New Counties Act, and it is contended that the board did not give the proper legal effect to the counter-petitions in granting them, because they were not signed by 50 per cent of the qualified electors resident in the territory sought to be excluded. These counter-petitions are the Wibaux petition (Exhibits 1, 5 and 6), and the Ismay petition (Exhibit 3), filed on May 1, the date set for the hearing. The board in affirming their sufficiency proceeded upon the theory that no counter-petition, pro-

test or withdrawal made or attempted after May 1 could be considered, and that the term "qualified electors," 50 per cent of whom are required for the exclusion of territory under section 2 of the Act, means those electors residing in the territory sought to be excluded whose names appeared on the great register at the date fixed for the hearing. So proceeding, the board declined to entertain certain additional counter-petitions filed after May 1 for the exclusion of the same territory, certain protests against the creation of the new county filed after May 1, certain representations filed after May 1, to the effect that the persons signing the same had withdrawn their names from the counter-petitions for exclusion (Exhibits 1, 3, 5 and 6), and certain offers to prove, without regard to the state of the great register on May 1 that the number of qualified electors, under the Constitution and residing in the territory sought to be excluded, was greater than double the number of those whose signatures remained upon the counter-petitions for exclusion after allowing all withdrawals. And thus it is substantially agreed by all the parties hereto, the following questions are presented:

Is it the intent of section 2 of the New Counties Act that a counter-petition for the exclusion of territory shall be signed by 50 per cent of the persons residing in such territory who possess the constitutional qualifications of electors, or by 50 per cent of the electors residing in such territory who have registered?

Should the board upon the hearing eliminate from the counter-petitions for exclusion the names of those whose withdrawal was filed before the final action of the board but after the date fixed for the hearing?

May the board upon the hearing entertain a protest against the new county, or a counter-petition for the exclusion of territory, filed before the final action of the board but after the date fixed for the hearing?

1. Counsel for the respondent board, citing *Bergevin* v. *Curtz,* [1, 2]   127 Cal. 86, 59 Pac. 312, ingeniously argue that by "qualified electors" 50 per cent of whom must sign a counter-

petition for the exclusion of territory is meant those electors who have qualified themselves to vote by registering. They say, in effect, that a distinction is to be observed between "electors," as persons possessing the constitutional qualifications, and "qualified electors," as electors who have registered so as to be entitled to vote; and hence the board, in determining whether a counter-petition for exclusion is sufficient as to signatories, has but to resort to the very simple process of consulting the great register as of the date fixed for the hearing. There is support for this construction in *Hawkins* v. *Board of Supervisors of Carroll Co.,* 50 Miss. 735, and it is attractive as furnishing a solvent for many of the difficulties incident to the administration of this rather complex law. But the construction suggested cannot be approved for several reasons. In the first place, the language employed is, apart from historical considerations, of clear and accepted meaning. Save where otherwise indicated, the term "qualified elector" means one who possesses the qualifications prescribed by the Constitution as necessary to entitle him to vote (Const., Art. IX, sec. 2), and not simply a registered voter; for one may possess all the constitutional qualifications and still be unable to vote for want of that registration which is also authorized by the Constitution "as necessary to secure the purity of elections." (*White* v. *Reagan,* 25 Ark. 622; *Notaries Public, In re House Bill 166,* 9 Colo. 628, 21 Pac. 473; *Board of Commrs.* v. *People,* 26 Colo. 297, 57 Pac. 1080.) That this is the correct conclusion is manifest upon a general review of the various statutes bearing upon the subject. One example will suffice. By the great register law (Chap. 113, Twelfth Session Laws), the county clerk is required to register all qualified electors. If "qualified electors" means registered electors, the county clerk is required to register the registered electors. An observation of the various sections of the statute in which the terms "electors" and "qualified electors" are employed will disclose that the use of them is indiscriminate. It is a principle [3] long established that registration is no part of the qualifications of an elector and adds nothing to them; it is merely a

method of ascertaining who the qualified electors are, in order that abuses of the elective franchise may be guarded against. (Mont. Const., Art. IX, sec. 9; *Capen* v. *Foster,* 12 Pick. (Mass.) 485, 23 Am. Dec. 632; *State* v. *Butts,* 31 Kan. 537, 2 Pac. 618; *Wilson* v. *Bartlett,* 7. Idaho, 271, 62 Pac. 416; *Hindman* v. *Boyd,* 42 Wash. 17, 84 Pac. 609.) Nor do we see anything in the context or purpose of the Act to warrant the inference that any other meaning was intended. The legislature could have said that a counter-petition to exclude territory should be signed by 50 per cent of the qualified electors thereof whose names appear upon the great register, but it did not say that, and the conclusion must be that it did not mean that, unless by such a conclusion the statute is rendered inoperative or unconstitutional. But it is possible for the board to do what the statute seems to require, *viz.,* ascertain the number of qualified electors in the territory sought to be excluded, whether registered or not, and determine whether 50 per cent of them actually signed the petition for exclusion; and the mere fact that such an inquiry may be difficult, or that a construction of the Act different from its apparent meaning would work to advantage by simplifying the inquiry, affords no reason for doing violence to the language of the Act.

So, too, we may grant that for the board to do what the statute apparently requires it to do may sometimes demand qualities of a high judicial order; still the inquiry is a preliminary one for administrative purposes only. It adjudicates no private right; establishes no precedent; settles no principle. The difference between such an exercise of decisional faculty and that involved in the common everyday affairs of the board is of degree merely and not of kind. It is of the character termed "*quasi* judicial" and constitutes no invasion of the constitutional provisions which lodge the judicial power of the state in its courts. (*State ex rel. Arthurs* v. *Board of County Commrs.,* 44 Mont. 51, 118 Pac. 804; *State ex rel. Jacobson* v. *Board of Commrs.,* 47 Mont. 531, 134 Pac. 291.) In *State ex rel. Bogy* v. *Board of County Commrs.,* 43 Mont. 533, 117 Pac. 1062, we

held that the board, in ascertaining whether the original petition for the creation of a new county is signed by one-half the number of electors whose names appeared upon the register for the preceding general election, must subtract from the whole number the names of all persons who since the election have lost their votes by death, removal, or other cause; in other words, the board must determine how many of those whose names appeared in the register for the preceding general election remain electors at the time the petition is filed. We can see no difference in kind between the duties thus imposed and those apparently imposed by the provision now under review.

There is another consideration which persuades us to the same conclusion. The language in question was brought forward into the present Act from the original Leighton Act (Twelfth Session Laws, Chap. 112). At the time the Leighton Act was passed, the law providing for the great register was not in existence; hence it cannot be said that the Leighton Act contemplated registration in the great register as an electoral qualification, or that the great register should be the sole, or any, basis upon which to determine the number of qualified electors resident in the territory sought to be excluded. Under the Leighton Act, if it became necessary to know the number of the qualified electors resident in any given locality, it was necessary for the board to resort to one or the other of the following courses: Either take the registration of the last preceding general election alone; or take the registration of the last preceding general election supplemented by proof *aliunde* of subsequent accessions and losses; or ascertain the fact by any means available. That the first of these courses was not the one in contemplation is clear from the language of the provision which then, as now, required the board to exclude territory "upon petition of not less than fifty per cent of the qualified electors thereof." This could refer only to the time when such petition was filed or presented; and to take the registration of the last preceding general election alone would of necessity exclude all qualified electors who had not registered for that election, as well as those who became

electors after that time, and would include those who since that time had ceased to be electors. So that either the second or third course must have been intended by the Leighton Act, and either of them presents, to a greater or less degree, the very embarrassments the avoidance of which is suggested as a ground for construing the same provision of the present law as referring to registered electors alone.

Our own conclusion is that under the Leighton Act, and under **[5]** the present Act, the provision in question requires the board to determine whether a petition for exclusion, at the time it was filed, contained the genuine signatures of one-half the qualified electors of the territory, regardless of registration, and that for such determination the board may resort to whatever competent evidence may be at hand, including the great register so far as it avails.

2. The counter-petitions for exclusion which were considered and granted, related to two different areas: the Wibaux territory (Exhibits 1, 5 and 6), and the Ismay territory (Exhibit 3). The board, confining itself to the great register as it appeared on May 1, found that there were 440 qualified electors residing in the Wibaux territory, and 161 in the Ismay territory. The counter-petition for the Wibaux territory, as filed, contained the names of 379 persons, of which number the board struck 92 because they did not appear upon the great register on May 1, thus leaving 287; from this number a further deduction of 35 was made, being the names of persons who had on May 1 filed their formal withdrawal; so that the final number which the board found to have been ''fifty per cent of the qualified electors'' in the Wibaux territory is 252. The counter-petition for the Ismay territory, as filed, contained the names of 123 persons, of which number the board struck 19 because they did not appear upon the great register on May 1, thus leaving 104; from this number a further deduction of 18 was made, being the names of persons who had filed their formal withdrawal on May 1, so that the final number which the board found to have been ''fifty per cent of the qualified electors'' in Ismay territory is 86. Upon these figures, if

the board had been justified in the several steps above detailed, its findings in favor of the counter-petitions were obviously correct, unless the further withdrawals of 35 names from the Wibaux counter-petition, and 6 names from the Ismay counter-petition, filed after May 1, but before final action upon these counter-petitions, should have been considered and allowed. [6] The authorities on this subject are collated and discussed in admirable notes to *State ex rel. Andrews* v. *Boyden,* 15 Ann. Cas. 1122 [21 S. D. 6, 108 N. W. 897], and *Sim* v. *Rosholt,* 11 L. R. A. (n. s.) 372 [16 N. D. 77, 112 N. W. 50], and we think the rule well established that, in the absence of legislative expression to the contrary, signers of a petition have an absolute right to withdraw therefrom at any time before final action thereon. (*Slingerland* v. *Norton,* 59 Minn. 351, 61 N. W. 322; *State* v. *Geib,* 66 Minn. 266, 68 N. W. 1081; *Lippincott* v. *Carpenter,* 22 Idaho, 675, 127 Pac. 557; *Littell* v. *Board of Supervisors,* 198 Ill. 205, 65 N. E. 78; *La Londe* v. *Board of Supervisors,* 80 Wis. 380, 49 N. W. 960; *Mack* v. *Polecat Drainage Dist.,* 216 Ill. 56, 74 N. E. 691; *Hoffman* v. *Nelson,* 1 Neb. (Unof.) 215, 95 N. W. 347; *Irwin* v. *Mayor etc. of Mobile,* 57 Ala. 6; *Misener* v. *Wainfleet Tp.,* 46 U. C. Q. B. 457.) Indeed, the above rule is a necessary inference from the very nature of the right of petition, and of necessity applies, not merely to the petitions themselves, but to the withdrawals, so as to authorize the withdrawal of a withdrawal.

We are not unmindful of the inhibition contained in the New Counties Act (to be later discussed) against the consideration of petitions and protests filed after the date fixed for the hearing; but a withdrawal is neither a petition nor a protest, and we are convinced that the board was clearly in error in refusing to consider the withdrawals in question.

The suggestion is before us that the exclusion of these withdrawals, if error, was not prejudicial to the proponents of the new county. We cannot understand this. It was the duty of the respondent board to give to the counter-petitions for exclusion the legal effect to which they were entitled. (*State ex rel. String-*

*fellow* v. *Board of Commrs.,* 42 Mont. 62, 111 Pac. 144.) This it could not do without knowing the number of the qualified electors in the affected areas at the time the counter-petitions were filed; and this it could not know by reference to the great register alone, and no other evidence was received.

The proponents of the new county, challenging the sufficiency of the counter-petitions, offered to prove that there were 473 qualified electors in the Wibaux territory, and 172 in the Ismay territory. These offers, though broad enough as alleged in the petition for the writ of mandate, seem to have been based upon the notion that registration after May 1 is sufficient proof of electoral *status* on May 1, which is not correct. (*State ex rel. Bogy* v. *Board of Commrs., supra.*) But the conclusion reached by the board cannot be aided by any infirmity in the offer of [7] the proponents, because the burden was not on them to establish the number of qualified electors in the area sought to be excluded. That burden was upon the counter-petitioners, and the failure was theirs if, after such evidence as they chose to present, or the board to procure, had been heard, no finding sufficient to support the counter-petitions was possible upon the facts proved. Neither is the matter aided, so [8] far as we can tell, by assuming the number of qualified electors in the affected areas to be as stated in the offer of proof, or by the fact that the board may or may not have erroneously stricken the 92 names from the Wibaux petition, and the 19 from the Ismay petition. Other than the great register, no evidence whatever was taken of the *status* of the persons whose names appeared upon the counter-petitions; as to 77 of them not even that evidence was before the board. In *State ex rel. Arthurs* v. *Board of County Commrs., supra,* we said: "While it does not appear from the face of the counter-petition that it is signed by at least 50 per cent of the qualified electors of the territory sought to be withdrawn, this fact is recited in the affidavit verifying the counter-petition, and this is sufficient *prima facie* showing of that fact." But there is nothing before us to indicate the manner in which the counter-petitions are veri-

fied, if at all. This, of course, does not affect the validity of the counter-petitions as such, since the act does not seem to require that they be verified; but they cannot be taken as *prima facie* evidence that the signers are qualified electors of the territory affected, or that they constitute 50 per cent of the qualified electors of the territory sought to be withdrawn, without an affidavit to that effect.

It does not follow, from what we have said, that the findings of the board as to the number of qualified electors of the territory sought to be excluded and as to what proportion of such electors had signed the counter-petitions, were wrong, but merely that there was no legal basis for them or any findings. This it must secure in order that the proceedings may go forward to whatever end may be proper.

3. The New Counties Act provides that, upon the filing of a [9] petition for the creation of a new county, the board shall "fix a date to hear proof on the said petitions and any opponents thereto," and at the time so fixed "shall proceed to hear the petitioners and any opponents, upon the petition or protests filed on or before the time fixed for the hearing; no petition or protests shall be considered unless the same is filed on or before the time fixed for the hearing." So far as any additional petitions for the creation of the new county or any protests against it are concerned, the above language clearly intends that the case shall be considered as made on the date fixed for the hearing. Nor do we encounter any difficulty in applying the same rule to counter-petitions for exclusion of territory whether they be couched in the language of protest or not. A counter-petition for exclusion is a petition and is so denominated in the Act. The inhibition is against all petitions and protests filed after the date fixed for the hearing, and the mere fact that the board is "upon the final hearing" to exclude territory does not warrant the inference that two hearings are intended, or that counter-petitions for exclusion filed after the date fixed for the hearing are to be considered, or that the sufficiency of those filed upon the date fixed for the hearing ought to be determined as of the date of the

hearing.    We think the language intends that the entire mat-
ter shall be heard and the proofs taken upon the case as made
upon the date fixed for the hearing, save as affected by subse-
quent withdrawals before final action, and that if, when the evi-
dence is all in, it shall appear that, on or before the date fixed
for the hearing, counter-petitions for exclusion were filed which,
after allowing all withdrawals, still contain 50 per cent of the
qualified electors of the territory involved therein, then the ter-
ritory affected by such counter-petitions shall be excluded.    If
we understand the record aright, the respondent board was
clearly correct in this portion of its proceedings.

Other questions than those above discussed are suggested in the
briefs or have occurred to us in passing.    They are not, how-
ever, adequately presented by the record, and we refrain from
discussing them.

While the relator is entitled to a peremptory writ of mandate,
we cannot go to the extent demanded by him.    The writ should
issue to the respondent board of county commissioners of Custer
county, directing them to reconvene within fifteen days after
service of the writ and annul the order made by them on May
13, 1913, granting the counter-petitions (Exhibits 1, 3, 5, and 6),
and thereupon to ascertain and find the number of the qualified
electors resident within the territory sought to be excluded on
the date the said counter-petitions were filed; to further ascer-
tain and find how many of the persons who signed said counter-
petitions for exclusion were qualified electors of the territory
described therein at the time the said counter-petitions were
filed, and whether, after allowing all withdrawals therefrom
presented before the said order of May 13, the said counter-
petitions contain the names of 50 per cent of persons who were
qualified electors of such territory at the time the counter-peti-
tions were filed; and if, so proceeding, the board shall find that
both counter-petitions contain the genuine signatures of 50 per
cent of the persons who were then qualified electors of the terri-
tory therein described, to grant the counter-petitions and deny
the petition for the creation of the new county; but if, proceed-

ing as herein directed, the board shall find that either the Wibaux counter-petition (Exhibits 1, 5, and 6) or the Ismay counter-petition (Exhibit 3) does not contain the genuine signatures of 50 per cent of the persons who at the time it was filed were qualified electors of the territory therein described, to deny such counter-petition and (excluding the territory described in the successful counter-petition, if either be successful) take such further proceedings as are required by law to submit the question of the creation of Fallon county to the electors concerned; and it is so ordered. Writ forthwith.

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.