STATE ex rel. WOOD, Relator, *v.* BOARD OF COUNTY COMMISSIONERS, Respondent.

(No. 3,464.)

(Submitted March 27, 1914. Decided April 22, 1914.)

[140 Pac. 728.]

*Mandamus—New Counties—Creation—Petitions and Counterpetitions — Sufficiency — Verification — Evidence — Board of County Commissioners—Rehearing.*

New Counties—Creation—Petitions—Signatories—Qualifications.
1. Under Chapter 133, Laws of 1913 providing that when it is sought to divide any counties and form a new one, a petition signed by at least one-half of the qualified electors of the proposed new county, whose names appear on the registration books at the last general election, shall be presented to the board of county commissioners of the county from which the largest area is proposed to be taken, and that where the proposed county is to be formed from two or more counties separate petitions shall be presented from the territory taken from each, and each petition shall be signed by at least one-half the qualified electors of each portion, a petition for a new county to be carved out

of two existing counties need only be signed by one-half of the qualified electors of the territory proposed to form the new county, as shown by the registration books used at the last general election.

Same—Counter-petitions—Burden of Proof.

2. A counter-petition for the exclusion of territory from a proposed new county must contain the signatures of at least fifty per cent of the qualified electors resident in the territory sought to be excluded, and the burden is on the counter-petitioners to show that fact on the hearing.

Same—Counter-petition—Verification—Proof.

3. A verification to a counter-petition asking for the exclusion of territory sought to be included in a proposed new county, which merely averred that each affiant believed that the counter-petition was signed by at least fifty per cent of the qualified electors of the territory sought to be excluded, was of no probative value as to the fact alleged.

Same—Verification—Not Evidence of Facts Alleged.

4. The New Counties Act does not require counter-petitions for the exclusion of territory from a proposed new county to be verified nor authorize the acceptance of a verification as probative; hence a verification *held* not to be evidence of the facts alleged therein.

Same—County Commissioners—Rehearing—Denial Proper.

5. After an order calling an election to determine whether a new county should be created had been made and the board of county commissioners clothed with jurisdiction had adjourned *sine die,* it was without power to grant a rehearing.

Original application for writ of mandate, by the state, on the relation of Royal S. Wood, against the board of county commissioners of Teton county, to compel respondent board to reconsider certain petitions in connection with the creation of Toole county. Dismissed.

*Messrs. Norris & Hurd,* for Relator, submitted a brief; *Mr. Edwin L. Norris* argued the cause orally.

*Messrs. Freeman & Thelen* and *Mr. Phil. I. Cole,* for Respondent, submitted a brief and argued the cause orally.

MR. JUSTICE SANNER delivered the opinion of the court.

Certain petitions for the creation of Toole county out of portions of Teton and Hill counties were presented to the board of county commissioners of Teton county and set for hearing on January 8, 1914. On that date the board convened, heard the petitions, held the same to be sufficient, and ordered an election for April 25, 1914. The relator challenges the proceedings upon the grounds: (1) That the petition from Hill

county was not signed by fifty per cent of the qualified electors resident in the territory described therein; and (2) that on January 7, 1914, a counter-petition, seeking the exclusion of a portion of such territory, was duly filed, signed by more than one-half of the qualified electors resident in such portion which counter-petition the board refused to grant. If the relator's position is sound in either respect, the proposed new county cannot, for lack of sufficient valuation, be created. A peremptory writ of mandate is sought to compel the board to reconvene and give proper legal effect to the counter-petition for exclusion and to the original petition from Hill county, by granting the one and denying the other.

The specific complaint against the original petition from Hill county is that the territory affected contains not less than 800 resident qualified electors; that said petition after allowing for withdrawals therefrom, had but 371 signers, which was less than fifty per cent of the qualified electors; and that the board, in determining said petition to be sufficient, relied, not upon the statutory verification thereto, but upon the testimony produced, and instead of ascertaining the number of qualified electors resident in the territory affected on January 8, 1914, used as a basis the registration list of Hill county for the general election of 1912. To establish the contention that this proceeding was inadequate, reliance is placed upon the decision of this court in *State ex rel. Lang* v. *Furnish,* 48 Mont. 28, 134 Pac. 297. The most cursory examination of the Furnish decision will demonstrate that it is rigidly confined to counter-petitions for exclusion, and does not in terms or effect apply to original petitions for the creation of new counties. There was a reason for this, and it may be found in the language of the Act then and now under consideration. We remarked: "The legislature could have said that a counter-petition to exclude territory should be signed by fifty per cent of the qualified electors thereof whose names appear upon the great register, but it did not say that, and the conclusion must be that it did not mean that, unless by such a conclusion the statute is rendered

inoperative or unconstitutional." Now, whatever may have been the reasons, that is what the legislature did say, in effect, in prescribing the character of the original petitions, for the Act in express terms provides: "Whenever it is desired to divide any county or counties and form a new county out of a portion of the territory of such then existing county or counties, a petition shall be presented * * * to the board of county commissioners of the county from which the largest area of territory is proposed to be taken. * * * Such petition shall be signed by at least one-half of the qualified electors of the proposed new county, whose names appear on the official registration books used at the general election held therein last preceding the presentation of said petition." The unmistakable meaning of this language is claimed to be destroyed by the proviso immediately following, viz.: "That, in cases where the proposed new county is to formed from portions of two or more existing counties, separate petitions shall be presented from the territory taken from each county; and each of said separate petitions shall be signed by at least one-half of the qualified electors of each of said proposed portions"—but it is quite clear to our minds that this is a subsidiary, precautionary provision designed, not to change the qualifications of the signers as fixed in the principal clause and which the legislature apparently thought it unnecessary to repeat, but to guard against another possibility. To illustrate by the present case: It could be maintained, without the above proviso, that the proceedings to create Toole county were properly initiated if the petition or petitions for the whole territory to be embraced in the proposed new county contained the signatures of fifty per cent of the registered electors thereof, notwithstanding that fifty per cent of such electors residing in the portion to be taken from Hill county had not expressed their assent. The obvious purpose of the proviso was to prevent any such situation.

That no distinction was intended to be based upon the creation of a new county wholly out of one old county, on the one hand, or out of two or more old counties, on the other, is suggested

by the requirements of the Act touching the manner of verify-
ing the petitions. ''There shall be attached to  *  *  *  said
petition or petitions the affidavit of three qualified electors
and taxpayers within each county sought to be divided, to the
effect  *  *  *  that it is signed by at least one-half of the
qualified electors of the proposed new county, or of the pro-
posed portion thereof taken from each existing county, where
the proposed new county is to be formed from portions of two
or more existing counties,  *  *  *  and that each of such
persons so signing was a qualified elector of such county therein
sought to be divided, at the date of such signing.'' The ref-
erence here is undoubtedly to such qualified electors as are
eligible for signers; else the verification is useless. But unless
we arbitrarily strike from the Act the provision that the petition
must be signed by at least one-half of the registered electors of
the proposed new county, it follows that, as regards the creation
of a new county out of one old one, the signers must be (a)
qualified electors of the territory affected, (b) whose names
appear on the registry for the preceding general election, and
(c) who constitute in number fifty per cent of all such per-
sons. This, in effect, was the holding in *State ex rel. Bogy* v.
*Board of County Commissioners,* 43 Mont. 533, 117 Pac. 1062;
and, if it be true of a petition for the creation of a new county
out of one old county, the identity of language used makes it
true where the new county is sought to be created out of more
than one old county. The same consideration applies with
regard to what the board must find, *viz.:* ''That said petition
contains the genuine signatures of at least one-half of the
qualified electors of the proposed new county, or in cases where
separate petitions are presented from portions of two or more
existing counties as herein required, that each of said petitions
contains the genuine signatures of at least one-half of the
qualified electors of that portion,'' *etc.* This language, stand-
ing alone, would under *State ex rel. Lang* v. *Furnish, supra,* be
held to refer to persons possessing the constitutional qualifica-
tions of an elector, but it does not stand alone. It has distinct

relation and reference back to the original requirement of the Act touching the qualifications of signers. (*State ex rel. Bogy* v. *Board of County Commissioners, supra.*) As these must, in the case of a new county sought to be created wholly out of an old county, be electors who have registered, so they must be in the case where the new county is sought to be created out of portions of two or more old ones, because there is no warrant in the language for discrimination.

The county commissioners of Teton county were therefore correct in adopting the previous registration as a criterion to determine whether a sufficient number of persons had signed the original petition from Hill county. The verification to the petition, and the evidence taken, alike disclose, and the relator does not question, that the 371 persons whose names remain upon the Hill county petition after allowing all withdrawals constituted at least fifty per cent of the qualified electors of the territory affected who had registered for the preceding general election. The relator's first contention, therefore, cannot be upheld.

2. It was not only necessary that the counter-petition in ques-
[2]   tion contain the genuine signatures of at least fifty per cent of the qualified electors resident in the territory sought to be excluded, but the burden was upon the counter-petitioners to show that fact upon the hearing. (*State ex rel. Lang* v. *Furnish, supra.*) No effort whatever was made to sustain this burden, but, as stated by counsel, the counter-petitioners "stood upon their petition." Not only did they do this, but vigorous resistance was offered on their behalf to the examination of two of the witnesses whose oath effected such verification. Much might be said concerning the attitude of these persons regarding the proceedings, and it is insisted that the board was justified in treating the verification as valueless on account of their testimony and conduct at the hearing. This it is not necessary to conclude, because the verification was valueless for other reasons. In the first place, it does not assert that the counter-petition is signed by at least fifty per cent of the qualified electors of the territory described, but merely that each of the verifiers

[3] believes such to be the case. Assuming that such verification might suffice to give status to a pleading or paper required by law to be verified, it could not under the most liberal view, be taken as evidence of anything more than the belief of the verifiers. But it is the fact itself that is of importance, and proof of a mere belief of that fact does not suffice. (*Benepe-Owenhouse Co.* v. *Scheidegger,* 32 Mont. 424, 80 Pac. 1024.)

Moreover, the New Counties Act does not require that the counter-petitions for exclusion of territory be verified. Attention was called to this fact in the *Furnish Case,* where it was [4] said they could not be taken as *prima facie* evidence that the signers constituted fifty per cent of the qualified electors of the territory sought to be excluded, without an affidavit to that effect. We now go further and say that, since the statute neither requires such verification nor authorizes the acceptance of it as probative, the counter-petition, though verified, cannot be given any evidentiary value. The functions of an affidavit in this state are defined by Article II, Chapter III, Title III, Part IV, of our Revised Code of Civil Procedure, and their use for giving *prima facie* verity to pleadings and papers is confined to such as are required to be verified. While, as remarked in *State ex rel. Arthurs* v. *Board of County Commissioners,* 44 Mont. 51, 118 Pac. 804, the proceedings under the New Counties Act are in a sense informal, and the board is to be viewed as the people's forum where the layman can be heard without the aid of counsel; yet the matter is by no means haphazard. The petitions and counter-petitions are in the nature of pleadings, final action is taken when the election is ordered, such final action is made to depend upon evidence, and the evidence must be of a character to warrant it. In the absence of statutory authority, an affidavit is not such evidence. (2 Cyc. 35; 1 R. C. L. 766.)

The relator insists, however, that the verification of the counter-petition is *prima facie* evidence under the *Arthurs Case;* but this is a misapprehension of the purport of that decision. No question of proof was before the court in that case; the

question being whether the counter-petition was sufficient as such. The body of the counter-petition failed to state certain facts, but these were stated in the verification, and we said that the body could be aided by the verification so as to make a complete statement of facts; and so we should hold concerning the counter-petition at bar, had its sufficiency as such been attacked. The question here is upon the *quantum* of proof, and for that the *Arthurs Case* is no authority.

Since it was not shown to the board that fifty per cent of the qualified electors of the territory sought to be excluded had signed the counter-petition in question, the denial of it was proper.

3. After the order calling the election had been made and [5] the board had adjourned *sine die*, a petition for rehearing was addressed to the board and filed on March 5, 1914, wherein it was offered to show, among other things, that the number of qualified electors resident in the territory sought to be excluded was not to exceed 64, and that the counter-petition for exclusion contained the genuine signatures of 42 of such electors. This petition was denied, and rightly so. We know of no provision or principle authorizing the granting of a rehearing by the board in such cases. The order for the election had gone forth; it was valid on the facts presented; and there was nothing further for the board to do.

The alternative writ heretofore issued herein is vacated, and the proceedings are dismissed at the relator's costs.

*Dismissed.*

Mr. CHIEF JUSTICE BRANTLY and Mr. JUSTICE HOLLOWAY concur.