FORD, Plaintiff, v. MITCHELL, Secretary of State, Defendant; WENZLER, Intervener.

(No. 7,625.)

(Submitted September 22, 1936.  Decided October 6, 1936.)

[61 Pac. (2d) 815.]

*Mr. S. C. Ford* and *Mr. Sam D. Goza, Jr.*, for Plaintiff, submitted an original and a reply brief and argued the cause orally.

*Mr. Raymond T. Nagle,* Attorney General, appearing in behalf of Defendant, made oral argument.

*Mr. C. A. Spaulding,* for Intervening Defendant Eugene Wenzler, submitted an original and a reply brief.

MR. JUSTICE ANDERSON delivered the opinion of the court.

This original proceeding was instituted by the plaintiff to restrain permanently the defendant Secretary of State from certifying to the several county clerks and recorders proposed Initiative Measure No. 38 as a bill to be submitted to the electorate. The defendant has demurred to the complaint upon the ground that it does not state facts sufficient to constitute a cause of action.

It appears from the complaint that plaintiff is a resident of the state, a taxpayer and a qualified elector who is entitled to vote at all elections. The official capacity of the defendant is made to appear by appropriate allegations. It is alleged that at the general election last preceding the filing of the proposed petition or petitions for the initiative of the measure in question, the whole number of votes cast for Governor was 216,381, and 8 per cent. of this number is 17,311, being the required number of signatures as provided by the Constitution and statutes in order to submit an initiative petition to the voters at the general election to be held on November 3 next; that section 100, Revised Codes, provides that every sheet for petitioner's signature "shall be attached to a full and correct copy of the title and text of the measure so proposed by initiative petition."

It is then alleged that an initiative petition was filed within time with the Secretary of State for the purpose of submitting to the electors at the next general election a proposed initiative measure designated as the "State Liquor Control Act of Montana," containing the names of 1,209 legal voters, to every sheet of which was attached a copy of the text and title of the measure proposed, a copy of which was annexed to the complaint marked Exhibit A; that subsequent to the filing of this petition another petition was filed within time with the defendant Secretary of State containing the same short title, appended to which were the signatures of 16,331 legal voters of the state, and attached to each sheet of this petition for the signatures of petitioners was a copy of the text and title of the measure so proposed by the initiative petition. A copy of this bill is attached to the complaint marked Exhibit B. We shall, for convenience, hereafter refer to these two measures as Exhibits A and B, respectively.

Plaintiff further alleges that, treating these two exhibits as separate petitions, neither has the required number of signatures for the submission of the measures to the electorate at the coming general election, and that, if they be treated as one petition, then the provisions of section 100, supra, are violated.

By appropriate allegations it appears that the defendant Secretary of State has treated the two petitions as one and certified to the Governor that a sufficient petition has been filed for the submission of Initiative Measure No. 38, the text of which is found in Exhibit B, at the coming election, who has issued his proclamation announcing that such petition has been filed and is being published as required by law, and that the defendant is threatening to and will, unless restrained by an order of this court, certify to the county clerks of the several counties his certified copy of the title and number of the proposed initiative measure to be voted upon at the election. The injury to the plaintiff and other taxpayers which will ensue should the defendant so proceed is appropriately alleged. It is alleged that the proposed ballot title is misleading and deceptive, and also that the Act is an appropriation measure.

The allegations of the complaint disclose that attack is made upon the initiative petition on four separate grounds, namely: (1) That it violates the provisions of section 100, Revised Codes, in that every sheet of the petition for petitioners' signatures did not have attached to it a full and correct copy of the title and text of the measure proposed; (2) that the petition is violative of section 1, Article V of the Constitution, in that it does not include the full text of the measure proposed; (3) that the same constitutional provision is violated in that the proposed law relates to the appropriation of money; and (4) that the proposed form of the ballot is deceptive and misleading. However, the facts stated in each are not at variance, and aside from advancing these various theories, are identical. In view of our conclusion, it will only be necessary to discuss the first contention of the plaintiff.

We have already quoted the pertinent part of section 100. Both Exhibits A and B seek to accomplish the same broad general purpose, namely, the regulation of the sale of intoxicating liquors. Many provisions of these exhibits are identical, but, as we shall point out, there are numerous differences in the text and title of these proposed Acts.

The proposed ballot titles are identical and the titles of the Acts are the same, except that Exhibit B in its title includes the subject of a "stamp tax." One other discrepancy between the two appears which is apparently a typographical error and unimportant.

Exhibit A by section 32 provides that nothing in the Act shall be construed to in any manner prohibit or prevent the legislature from enacting a tax upon liquor sold in the state, the only restriction being that any such tax shall be reasonable and not in excess of 10 cents per pint or fraction thereof. Exhibit B by section 32 provides for a tax of 10 cents per pint or fraction thereof on all liquor exceeding 6 per cent. of alcohol by volume sold in the state, except wines containing more than 6 per cent. of alcohol, and less than 21 per cent. by volume, which shall be taxed at the rate of 5 cents per pint or fraction thereof. This section further provides for the supplying of stamps to evidence the payment of the tax which shall be affixed to the container of the liquor before it is sold to licensed retailers, and all licensed wholesalers are required to keep such books and records as the board may require. Section 28 provides for the disposition of funds accruing under the provisions of the Act and mentions taxes. Exhibit A is silent as to these particular provisions mentioned supra.

Section 2 of Exhibit B, in enumerating the various parts of the Act, mentions that part 2 relates, among other things to the licensing and regulation of wholesale vendors. The corresponding section of Exhibit A is identical aside from this provision. Section 5 of Exhibit B relates to the employment and duties of a license clerk to be employed by the board created by the Act, wherein it is made the duty of this appointee to attend to the issuance of licenses to wholesale licensees. Section 6 of Exhibit B directs the board to prescribe a uniform license to be issued under the provisions of the Act to wholesale licensees. The corresponding section of Exhibit A makes no mention of wholesale vendors. The only mention of wholesale vendors in Exhibit A is found in section 8, wherein it is provided that licensed retail vendors must make all pur-

chases from regularly licensed wholesale vendors. Subdivision j of section 7 requires a chemical analysis of all brands of liquor sold in the state to be sent annually in a report of such to all retailers. Section 7 of Exhibit B provides that the reports of chemical analyses shall be posted publicly by licensees in their places of business.

Section 8 of Exhibit A provides that persons who sell or offer for sale liquors or wines containing 4 per centum or more of alcohol by volume must obtain a license. Section 8 of Exhibit B provides that such persons who sell liquor or wines containing 6 per centum or more of alcohol by volume must obtain a license. Section 8 of both Acts contains the provisions relative to the amounts of the various forms of licenses. Section 8 in Exhibit A provides that persons selling in package only shall pay a license of $75. No corresponding provision is found in Exhibit B. Wholesalers, by the provisions of Exhibit A, pay a license of $250, whereas under Exhibit B they are required to pay a license of $1,000. Clubs pay a license fee of $50 under Exhibit A, and under Exhibit B the same license as any retailer doing business in the same county. By the provisions of section 15 of Exhibit A persons licensed outside of a city pay double the license charged in the county, whereas under the provisions of the same section in Exhibit B licensees pay double if operating within the area less than ten miles from a city, but otherwise they pay the same as licensees within a city.

Section 11 of Exhibit A provides that no person shall be granted more than one license in any year. Exhibit B provides that no person, firm, association or corporation shall be granted more than one license in any one year, and if such licensee maintains more than one store in the state, the store having the license must take all orders and make all deliveries of liquor purchased from such licensee, and any additional stores not having a license are prohibited from taking orders or making deliveries or taking orders and transferring the same to the store having the license. Section 12 of Exhibit B, after providing that no licensee is permitted to display the

word saloon, bar or barroom at his place of business, contains an additional provision not found in the corresponding section or in Exhibit A to the effect, "nor shall any licensee cause to be erected any obstruction which will prevent a clear view of the building from the street."

Subdivision (a) of section 13 of both Acts relates to the hours of closing. By that section in Exhibit A the hours of closing on Sunday are from 2 A. M. to 1 P. M. The same section of Exhibit B contains the same provision and the following in addition: "Or any other day between 2 A. M. and 8 A. M."

Section 17 provides in Exhibit A that persons who desire to obtain employment as dispensers of alcoholic beverages are required to secure a permit to do so. Section 17 of Exhibit B requires the dispensers to secure an annual permit.

Section 22 of both Acts relates to penalties for violation of the provisions of the Acts. Exhibit A provides for the first offense a penalty or a fine of not more than $100 or imprisonment not to exceed six months. Under the provisions of Exhibit B for the first offense a fine of not more than $500 or imprisonment for not less than six months, or both, is provided. For the second or subsequent offense in Exhibit A it is provided that the fine shall not be less than $200, nor more than $2,000, and imprisonment for not less than one month nor more than five years. For the second offense, under the provisions of Exhibit B, the fine is not less than $1,000 and imprisonment for not less than one year, and upon the third or subsequent offense the penalty is imprisonment for not less than two years.

Section 31 provides for the distribution of profits accruing from licenses, taxes, fines and penalties. Exhibit A provides that one-half of the profits accruing shall be distributed to the general fund of the state. Exhibit B provides that one-sixth of the profits shall go to the general fund and one-third to cities within the counties from which the licenses, taxes, fines and penalties are collected.

Section 37 provides that certain peace officers are empowered to seize liquor illegally kept. By the provisions of Exhibit A

highway patrolmen are enumerated among these officers. In Exhibit B these officers are stricken from this list.

By section 50, containing definitions of the terms used in the Act, "liquor" is defined, by subdivision f, to include any alcoholic liquor which contains more than 4 per cent. of alcohol by volume. This is changed by Exhibit B to 6 per cent. of alcohol by volume. Subdivision h defines the word "package" in Exhibit A to mean any container or receptacle used for holding liquor. The same term is defined in Exhibit B to refer to the original container or containers. Subdivision s, in Exhibit A, defining "wholesalers," refers to any person selling liquor to licensed retail vendors. In addition to this definition by the provisions of the same subsection of Exhibit B, a wholesaler is required to confine his sales to original packages only, which must not exceed one gallon in liquid measure.

Section 75 of Exhibit A declares that the Act is not intended to interfere with regulatory measures providing for the sale of beer and other fermented beverages containing less than 4 per cent. of alcohol by volume, and that the Act shall be administered and applied in conjunction with Acts regulating the sale and distribution of beer and other fermented beverages. Section 75 of Exhibit B declares that regulatory measures of the beer Act shall hereafter relate to beer and other alcoholic beverages containing 6 per cent. of alcohol by volume or less, and that persons licensed under this Act may sell beer without any additional license.

Section 79 of Exhibit A contains the repealing clause, whereas in Exhibit B section 79 provides that any property or stock acquired by the state under the provisions of the present state liquor Act shall be disposed of by the board in the manner deemed most advisable and profitable to the state, and the profits derived therefrom shall be distributed as set forth in section 31 of the proposed Act, which method of distribution is at variance with the provisions of section 2815.157, Revised Codes.

Thus the question is fairly presented, in the light of these numerous differences between the two Acts: Did the

signers of Exhibit A have before them a correct copy of the title and text of the measure proposed to be initiated by the provisions of Exhibit B? We approach the consideration of this subject bearing in mind that the people have reserved to themselves the right to exercise the powers of the initiative; the statutes enacted in aid of these powers "should be liberally construed and should not be interfered with by the courts, except upon a clear showing that the law is being violated." (*State ex rel. Freeze* v. *Taylor*, 90 Mont. 439, 4 Pac. (2d) 479, 482.)

The purpose of a statute similar to section 100, supra, with reference to initiative and referendum petitions, has been very well expressed by the supreme court of Arkansas in the comparatively recent case of *Townsend* v. *McDonald*, 184 Ark. 273, 42 S. W. (2d) 410, 412, wherein the court said: "The purpose of the section with regard to petitions for initiative measures is clear. The people could not intelligently act on initiative measure, unless a copy of the measure itself was before them. The same reasoning would obtain in cases of a measure referred to the people. A full and correct copy of the measure attached to the petition would enable the signer thereto to act intelligently in the premises. Of course, he would not be required to read the measure, but it would be his duty to inform himself of its contents, and this would be a certain way for the signer to know that a different petition would not be presented from that signed by him. The signer would know that he was signing the measure passed by the legislature, and was not taking the opinion of anyone else as to the meaning of it. Otherwise, those in charge of the petition, either designedly or ignorantly, might inform the petitioners that the meaning of the bill proposed to be referred was essentially and substantially different from the one actually passed by the legislature. If a full and correct copy of the bill is attached to the petition, the voter can decide that question for himself. Hence, a majority of the court is of the opinion that the requirement is clearly jurisdictional, and that the Secretary of State is without power to act, in the absence of a substantial

compliance with this requirement of the statute.  *  *  *  The statute was not passed as a mere matter of convenience or direction to be observed either by those circulating the petitions or by the Secretary of State.  The Act was passed as a safeguard to the rights of the voters to whom the petition was offered for signature.  The requirement was intended to secure the voters, whose interests were to be affected, an opportunity to know what they were signing, and to know that they were not signing something different from those whose signatures appeared on the petition.  This is a right of great benefit to the voters, and we do not think the requirement should be regarded as merely directory, but that it is a substantial right which is of a mandatory character, and must be complied with or the proceeding will be void."

It is generally held by the courts that similar provisions as to the contents of an initiative petition are mandatory and not directory and that a petition which does not comply with such a statutory provision does not warrant the submission of a proposed initiative measure to the vote of the people. (*Preckel* v. *Byrne,* 62 N. D. 356, 243 N. W. 823; *Dyer* v. *Hall,* 51 N. D. 391, 199 N. W. 754; *Westbrook* v. *McDonald,* 184 Ark. 740, 43 S. W. (2d) 356, 44 S. W. (2d) 331; *In re ·Opinion of the Justices,* 271 Mass. 582, 171 N. E. 294, 69 A. L. R. 388; *Brooks* v. *Secretary of Commonwealth,* 257 Mass. 91, 153 N. E. 322; *Scott* v. *Secretary of State,* 202 Mich. 629, 168 N. W. 709; *State ex rel. McHenry* v. *Mack,* 134 Or. 67, 292 Pac. 306, 308.)

In the case of *State ex rel. Baker* v. *Hanna,* 31 N. D. 570, 154 N. W. 704, 706, under a provision similar to our section 100, with respect to a referendum petition was before the court for consideration. Two petitions, as here, were filed. Neither contained a sufficient number of signatures alone to warrant the referring of the bill in question.  One group of petitioners proposed to refer to a vote of the people all of the provisions of an Act of the legislature.  The other group proposed to refer only one section of the Act which related exclusively to the appropriation contained therein.  The question as stated by the court was, "Can these two petitions for refer-

110

endum, one of the entire Act and the other of but the appropriation part of it, be consolidated and considered as one petition for a referendum of the appropriation?'' The court, in disposing of this question, said: ''To hold that these two petitions, widely divergent in subject-matter and object sought, can be consolidated as a petition for and work a referendum of section 7 would be to violate the expressed intent of all those petitioning for a referendum of the entire Act, inasmuch as it would be holding them petitioners for something, not only not asked for or sought, but plainly contrary to their desires.''

As we have pointed out supra, the provisions of the two Acts differ in many and various particulars. It cannot be said that the petition signed by the petitioners on Exhibit A contains a full and correct copy of the text of the Act proposed to be initiated by Exhibit B. We hold the provisions of section 100 are mandatory, at least where, as here, the question is raised prior to the submission of the proposed measure to a vote of the people at an election and a favorable vote on such measure obtained. We need not now consider what our decision would be if such a measure had been submitted and received a favorable vote. The names of the petitioners appearing upon Exhibit A may not properly be counted in considering the number of signers upon Exhibit B, and the Secretary of State was in error in so counting them.

Following the submission of the cause after argument, counsel for plaintiff and for the defendant stipulated that ''if deemed desirable for the final determination of this action, the court may without objection on the part of either party examine the record in the office of the Secretary of State of the state of Montana with relation to the petitions for Initiative Measure No. 38 and consider the same as though all said records and petitions had been introduced and accepted as competent evidence.''

Thereafter one Wenzler petitioned this court through his counsel for leave to intervene in the proceeding; this was granted, and thereafter he filed his answer and brief present-

ing certain questions not theretofore brought to the attention of this court which we will now proceed to consider. Plaintiff filed a reply to this answer, admitting certain parts and denying others. The various facts as set forth in this answer will be referred to in appropriate places throughout the remainder of this opinion.

It is first alleged that this court cannot with propriety assume original jurisdiction of this cause. It is argued that no sufficient showing is made in the complaint sufficient to invoke the original jurisdiction of this court. It is conceded that under section 3 of Article VIII of our Constitution, this court may in certain cases assume original jurisdiction for the purpose, among others, of granting writs of injunction. It is contended that any infirmities in the proceedings relative to the initiation of Initiative Measure No. 38 were apparent from the records in the office of the Secretary of State at least as early as July 3 of this year, on which date the Act was certified to the Governor as a measure to go on the ballot in the coming election in November; that the plaintiff could as well have commenced her action thereafter in the district court in sufficient time for it to be heard, decided, and, if desired, reviewed by this court instead of waiting until September 17 before attempting to secure any relief from the courts, which was the day application was made to this court for the issuance of an order to show cause.

By the provisions of section 3 of Article VIII this court is empowered in its discretion to issue prerogative writs of injunction. When this court entertained the application for leave to file the complaint in this proceeding, it thereby, upon the issuance of an order to show cause, exercised discretion in favor of jurisdiction of this case, and what counsel for the intervener has said was appropriate for the consideration of the court at that time, but having accepted jurisdiction, the contention of the intervener now comes too late.

It appears from the answer of the intervener that there were filed in the office of the Secretary of State three petitions which it is said have an identical title, all of which were for the ini-

112

tiation of a state liquor control measure. The first was the one filed by one St. Clair, signed by 9,410 legal voters of the state of Montana. The second was filed by one Frazer, which is Exhibit A, and the third was the one to which we have referred as Exhibit B. It is alleged that the Secretary of State ignored the St. Clair petition. It further appears from the answer that on or prior to July 3, 1936, 1,008 withdrawals of signatures from the initiative petition bearing the title to these respective measures were filed and allowed as such by the Secretary of State. It is made to appear that all of these withdrawals, other than 27, were filed prior to July 3, 1936. It is alleged that prior to the allowance of any withdrawals, the petition Exhibit B contained the names of 17,339 legal signers, and that 17,311, which conforms to the allegations of plaintiff's complaint, was the necessary number of signatures in order to initiate a measure at the next general election. It is alleged in the answer that for various reasons, which we will later notice, the Secretary of State was without right or authority to allow withdrawal of these signatures, and that therefore Exhibit B, standing alone, without taking into consideration the signers on Exhibit A as was done by the Secretary of State, was sufficient for the submission of Initiative Measure No. 38 to a vote of the people. It may be observed in passing that the intervener concedes that Exhibits A and B are two separate and distinct measures.

We will now give consideration to the various contentions of the intervener with reference to the withdrawal of names from the initiative petition. It is argued that withdrawals of names from initiative petitions are not properly allowable. It is conceded that both our constitutional provisions and statutes relative to initiative measures contain neither an express sanction nor prohibition of withdrawals, but it is contended that by reason of the silence of these enactments impliedly the right of withdrawal is denied to the elector who has signed an initiative petition. This court has not heretofore passed upon this identical question with reference to initiative petitions, but has considered this right with reference to other petitions

addressed to public boards authorized by law to hear and grant or deny the prayer of petitioners for the calling of elections, for the creation of new counties, and the calling of an election in a county under the local option law. In the case of *State ex rel. Lang* v. *Furnish*, 48 Mont. 28, 134 Pac. 297, 300, involving a proceeding for the creation of a new county where certain counter petitions had been filed with the board of county commissioners, the tribunal having jurisdiction under the law to hear the petition seeking to exclude certain territory from the boundaries of the proposed new county, and the latter petition being likewise authorized by the law, the board of county commissioners declined to allow certain withdrawals from the counter or excluding petitions filed during the progress of the hearing. This court in passing upon the right of the signers of the counter petition to withdraw therefrom, said: "We think the rule well established that, in the absence of legislative expression to the contrary, signers of a petition have an absolute right to withdraw therefrom at any time before final action thereon. [Citing authorities.]"

This court, in the local option case of *State ex rel. Fadness* v. *Eie*, 53 Mont. 138, 162 Pac. 164, and in the later county division case of *State ex rel. Faragher* v. *Moulton*, 68 Mont. 219, 216 Pac. 804, adhered to its pronouncement in the case of *State ex rel. Lang* v. *Furnish*, supra. However, in the latter case the court observed that this right extended to a withdrawal from a withdrawal. That question was not before the court in the case, and in the two subsequent decisions cited supra this court receded from that statement to the extent of saying that the right to withdraw from a withdrawal was not absolute, and, therefore, discretion could not be controlled by mandamus, and in the case of *State ex rel. Faragher* v. *Moulton* refused to control the discretion of the board in refusing to consider withdrawals from withdrawals.

The right of a petitioner to withdraw from a petition was stated by this court in the case of *State ex rel. Freeze* v. *Taylor*, 90 Mont. 439, 4 Pac. (2d) 479, 481, in the following language: "The general rule is that where a petition of a cer-

tain number of electors is required to initiate proceedings for a public purpose, any person signing the petition has an absolute right to withdraw his name at any time before the person or body created by law to determine the matter submitted by the petition has finally acted. (*State ex rel. Lang* v. *Furnish*, 48 Mont. 28, 134 Pac. 297, and cases cited.)'' We see no reason why a different rule should prevail with reference to a petition for the initiative of a measure and petitions such as have been before this court for consideration in the past. We therefore adhere to our former decisions and hold that the signers of an initiative petition may, in an appropriate manner and at the proper time if they so desire, withdraw from such petition.

It is further contended that the various withdrawal petitions are not properly certified by the several county clerks and recorders in which counties the various signers of these withdrawals reside. Pursuant to the stipulation referred to supra, we have examined a number of these certificates and particularly the certificate appended to the withdrawal petition from Fallon county. It is in the identical form prescribed by the legislature for certificates with reference to signatures found on an original initiative petition as provided by section 101, Revised Codes, which declares that every such certificate shall be prima facie evidence of the facts stated therein and of the qualifications of the electors whose signatures are thus certified to be genuine. A certificate which is sufficient prima facie evidence of the qualifications and the genuineness of the signatures of the electors on an initiative petition certainly should have the same probative effect when found on the petition for the withdrawals of names from an initiative petition, and we so hold. (Compare *State ex rel. Westhues* v. *Sullivan*, 283 Mo. 546, 592, 224 S. W. 327.)

It is alleged in the answer that the titles to the three Acts are the same, and that the certificates do not show which of the petitions for the three Acts the person signing signed the withdrawals, and that they are therefore insufficient, and that this fact cannot be ascertained without an accurate check

of the withdrawals and the petitions, and that no such check has been made by the Secretary of State.

As we have stated above, it is conceded that 17,311 legal signers were necessary for the initiative petition to become operative. It is asserted that, without allowing the withdrawals, Exhibit B has 17,339 signers. The number in excess of the required number on Exhibit B is 28. Again agreeably to the stipulation on file, we have carefully examined the original petition containing the names on Exhibit B, from Fallon county, from which county there was also a withdrawal petition. We find 73 names appearing on the withdrawal petition, and that without question 62 of the persons who signed the initiative petition, Exhibit B, also signed the withdrawal petition. This particular withdrawal petition was filed on July 1, 1936, and the initiative petitions from that county were filed in the months of February and March of that year. The name of each of these 62 persons was certified to by the county clerk both on the initiative petition and the withdrawal petition as of a person qualified to sign accompanied by the usual certificate as to the genuineness of their signatures. Allowing these 62 names from Fallon county to be withdrawn leaves Exhibit B with insufficient signatures. Therefore, assuming that the Secretary of State did not compare the signatures as alleged nor determine whether they had signed Exhibit B, nevertheless there were sufficient withdrawals from this one county alone to destroy the validity of the initiative petition.

Some argument is made that it cannot be ascertained from the withdrawal petition which initiative petition the petitioners claimed to have signed. Again reverting to the withdrawal petition from Fallon county, there appeared printed on each page to which signatures were affixed a true, complete, and correct copy of the title appearing on Exhibit B, which differed from the title of Exhibit A as pointed out supra, in that it mentioned a stamp tax which was absent from the title of Exhibit A. Furthermore, likewise there was printed at the top of each sheet as a part of the description of the bill after the title referring to the petition, the following: "And which

said petition purports to have been printed and circulated by the Montana Initiative Association, box 784 Billings, Montana.'' At the end of the initiative petitions which were circulated as Exhibit B, following the printed text of the measure, appeared the legend, ''printed and Circulated by Montana Initiative Association, box 784 Billings, Montana.'' A clearer and more positive identification of the petition from which these electors were attempting to withdraw, in the light of the facts and circumstances, could not well be imagined.

It is contended that, conceding the right to withdraw, it may not be exercised at any time after the county clerk and recorder has affixed his certificate to the petition to which the signature of any given petitioner desiring to withdraw his name is affixed, and that upon the certificate being appended by the county clerk and recorder the action becomes final, and no subsequent withdrawal may occur. True, at some time the right to withdraw must cease, and this court held in the *Lang-Furnish Case,* supra, that the right to withdraw from the petition there under consideration existed until final action by the board of county commissioners either granting or denying the petition. We think the rule there adopted is correct.

Counsel in support of his contention lays great stress upon the provisions of section 102, Revised Codes, declaring that the Secretary of State must immediately upon the filing of an initiative petition signed by the requisite number of the voters and filed within the time required by the Constitution, certify that fact to the Governor in writing. It is said that the word ''immediately'' does not permit of any delay. Manifestly, the statute requiring the Secretary of State to make certificates, and companion statutes requiring him to determine certain facts in connection with the handling of these petitions, must be construed to afford that officer sufficient time reasonably and accurately to perform his duties required by law. The Secretary of State must determine the sufficiency of the petition as to the requisite number of signers. These views are in accord with the declaration of this court in *State ex rel. Freeze* v. *Taylor,* supra. We therefore hold that the right to

withdraw exists until the Secretary of State has finally determined, in the manner provided by statute, that the petition is sufficient.

The other questions raised by plaintiff, in view of the foregoing, are unnecessary to a decision in this case.

For the reasons mentioned supra, we hold that the Secretary of State did not have before him a sufficient petition for the submission of Initiative Measure No. 38 to a vote of the people at the ensuing general election, and that, accordingly, he was in error in certifying the same to the Governor. Hence, the demurrer is overruled. Let judgment be entered perpetually restraining and enjoining the defendant Secretary of State from furnishing or including as a part of the official ballot to be certified by him to the several county clerks any certified copy of the title and number of proposed Initiative Measure No. 38.

ASSOCIATE JUSTICES MATTHEWS, STEWART and MORRIS concur.

MR. CHIEF JUSTICE SANDS, absent on account of illness, did not hear the argument and takes no part in the foregoing decision.