N O.   93-183

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

DAN BUCKLEY and ROBERT DOUGLAS and
DONNA DOUGLAS, ALBERT ADAMS and
MARILYN ADAMS, GLORIA DOYLE, CHET
DREHER and VERA DREHER, LOUIS DYLL,
JAMES DYLL, DONALD FREDRICKSON,
LOUISE FULBRIGHT, GARY GUTHRIE and
JILL GUTHRIE, DAVID HARTNETT, RICHARD
JORGENSEN, DONALD LAIS, KATE LAWLER,
VICTORIA MACLEAN, THOMAS MCBRIDE,
INDIA SUPERA and LAUGHING WATER,
CHRIS YAHVAH, DOUG POWELL and SONIA
POWELL, JAMES POWELL, GAIL WILSON and
PAUL WILSON, EUGENE NIXON and NORMA
NIXON and STEVE BALAZS and JANELLE BALAZS,
          Plaintiffs and Respondents,

          -v-

BLAKE WORDAL, LINDA STOLL-ANDERSON,
and DAVID FULLER, in their capacity
as Lewis and Clark County Commissioners,
LEWIS AND CLARK COUNTY, a local
governmental unit and political division
of state government, and MONTANA ATTORNEY
GENERAL MARC RACICOT,
          Defendants and Appellants.


APPEAL FROM:   District Court of the First Judicial District,
               In and for the County of Lewis and Clark,
               The Honorable James E. Purcell Judge presiding.

COUNSEL OF RECORD:

          For Appellants:

               K. Paul Stahl, Deputy County Attorney, Helena,
               Montana

          For Respondents:

               John C. 'Doubek & Carl A. Hatch, Small, Hatch,
               Doubek and Pyfer, Helena, Montana

Submitted on briefs:   October 28, 1993

Decided:   December 7, 1993

FILED

DEC 07 1993

Filed:   *Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Clerk

Justice James C. Nelson delivered the Opinion of the Court,

Defendants/Appellants appeal an order of the First Judicial District Court, Lewis and Clark County, stating that the Defendants/Appellants had not complied with a prior modified order and ordering them to delete or refund rural improvement district assessments and re-notice the hearings which initiated the rural improvement district process. We reverse.

We state the issues on appeal as follows:

1. Did the Board of County Commissioners for Lewis and Clark County (BOCC) timely file its notice of appeal?

2. Did the BOCC follow the correct statutory procedures when it created the Colorado Gulch Rural Improvement District (CGRID)?

3. Did the District Court err in holding that the BOCC failed to hold adequate public hearings when creating the CGRID?

The BOCC also contends that the plaintiffs did not file a timely complaint. Given our holdings on the above issues, that issue is moot.

The current controversy began in 1991, when landowners in the Colorado Gulch area formed a committee to address various road problems. However, the controversy regarding improvements to the road in question has a long history, and the BOCC has been actively involved since as early as 1984 or 1985.

On March 23, 1992, the committee called a meeting of all landowners in the Colorado Gulch area to vote on whether to form a rural improvement district. At this meeting, each parcel of property in the area for which a property identification number

2

could be traced was given a vote, and the assessed value of each parcel was not taken into consideration. A vote regarding the rural improvement district was taken, and the majority of landowners present opposed creating the district.

After the March, 1992, meeting, the original committee was disbanded. Thereafter, a *'splinter group" from the committee sent a letter to all Colorado Gulch landowners, revealing their intent to attempt to persuade the BOCC to create a rural improvement district for the purpose of having the road chip-sealed.

The BOCC requires that, prior to any formal action on a proposed improvement district, a petition from the potentially-affected landowners be filed evidencing a "significant interest" in the creation of such a district. The purpose of this requirement is to avoid county staff time being wasted if no interest exists for the creation of a district.

In this case, the "splinter group" filed the required petition. Based on that petition, the BOCC found significant public interest in the rural improvement district, and adopted a resolution of intent to create the CGRID on April 28, 1992. After the adoption of the resolution to create the CGRID, a Notice of Resolution of Intent and Public Hearing was sent to all property owners in the proposed district. The notice informed the landowners of the adoption of the resolution to create the CGRID, indicated the nature of the proposed improvements and maintenance, and proposed a formula to be used for assessments. The notice also provided estimated costs, informed the landowners of their right to

file a written protest within fifteen days (by 5:00 p.m. on May 18, 1992), and informed the landowners that the public hearing was scheduled for May 19, 1992.

All written protests were properly filed by May 18, 1992. On the morning of May 19, 1992, two landowners filed rescissions of their prior written protests.

The BOCC held the public hearing on May 19, 1992. At that time, staff members informed the BOCC that further work was required to answer questions raised by various protests. After some discussion, the BOCC chairperson requested comments from the audience, and one person spoke. Following that person's comments, the chairperson again requested questions or comments, but no one responded. The chairperson of the BOCC then publicly announced that the hearing was adjourned and continued until May 26, 1992, in order to allow the staff time to address the validity of certain protests.

At the May 26, 1992, hearing, staff members again informed the BOCC that additional time was needed to complete a review of the protests. The chairperson of the BOCC again publicly announced that the hearing was adjourned and continued until May 28, 1992.

At the May 28, 1992, hearing, the BOCC heard and passed on all protests submitted prior to the May 18 deadline. Dorothy Carrico and Leah Tursich rescinded their protests by written request, and the BOCC accepted those rescissions. The BOCC rejected a protest filed by Don Dais because both record landowners did not sign the protest. A protest filed by James Powell was rejected for one

4

parcel because the parcel had been deeded to the Smiths, who did not wish to protest. The BOCC rejected three protests signed by Laughing Water because the joint tenant, India Supera, did not sign the protests and Mr. Water did not present a written power of attorney to sign on her behalf. The protest total, after the BOCC accepted the rescissions and rejected the above protests, was 44.5% of the landowners. After this hearing, the BOCC adopted a resolution creating the CGRID.

On July 1, 1992, the plaintiffs, all of whom own real property affected by the CGRID, filed a complaint alleging violations of Montana statutes and constitutional provisions. The plaintiffs sought temporary and injunctive relief and a writ of prohibition, as well as a declaratory ruling that §§ 7-12-2101, et seq., MCA, were unconstitutional.

District Judge Thomas Honzel deemed himself disqualified and invited District Judge James Purcell to assume jurisdiction, which Judge Purcell did on July 7, 1992. On July 22, 1992, the District Court ordered the BOCC to show cause why injunctive relief should not be granted. A hearing was held on August 11, 1992. During that hearing, the protest total calculated at the May 28, 1992, meeting was revised to 45.45%. as Don Lais' protest was accepted after he submitted a quit claim deed evidencing his sole ownership of the property in question.

On August 13, 1992, the District Court issued findings of fact, conclusions of law, and an order denying relief to the landowners "under any theory." However, the District Court

5

chastised the BOCC for taking the "most convenient statutory route . . . without debating the substantive nature of the protestor's complaints."

The plaintiffs moved the District Court to modify its August 13, 1992, order and the BOCC failed to file a response. On August 18, 1992, the BOCC adopted a resolution levying and assessing a tax upon all benefitted property within the CGRID. On September 3, 1992, the BOCC held a hearing to receive and consider objections to the assessments proposed to be levied on the landowners' property. The chairperson opened the discussion to comments about the assessments and to questions and comments regarding the creation of the CGRID and the BOCC's actions. After this hearing, the BOCC delivered the final resolution creating the CGRID to the county treasurer for assessment purposes.

On September 16, 1992, the District Court "amended" its original order dated August 13, 1992, apparently based on the BOCC's failure to respond to the plaintiffs' motion to modify. In that modified order, the District Court ordered the BOCC to re-notice the hearings and allow all the Colorado Gulch landowners an opportunity to participate in the hearings. By this time, the chip-sealing of the road had been completed.

On September 17, 1992, the BOCC moved the District Court to modify its "modified order" and requested a hearing. The District Court took no action on the BOCC motion and did not hold a hearing. Then, on November 27, 1992, the plaintiffs moved the District Court to enforce the September 16, 1992, modified order. On January 8,

6

1993, the District Court ordered the BOCC to show how it had complied with the modified order or to re-notice the hearings. The BOCC filed proof of compliance with the modified order on January 15, 1993, and the District Court heard oral argument on February 9, 1993.

On March 10, 1993, the District Court issued a final order stating that the BOCC had failed to comply with the September 16, 1992, modified order by refusing to re-notice the hearings, and ordered the county to mail retroactive notices to delete or refund the CGRID assessments, and to re-notice the hearings which initiated the CGRID process. From that order, the BOCC appeals.

Our standard of review relating to conclusions of law is whether the trial judge's interpretation of the law is correct. Steer, Inc. v. Dep't of Revenue (1990), 245 Mont. 470, 474-75, 8O3 P.2d 601, 603.

I — NOTICE OF APPEAL

Plaintiffs contend that the BOCC did not timely file its notice of appeal and that this appeal should be dismissed. We disagree.

The basis for the plaintiffs' argument is that the BOCC is appealing from the District Court's decision filed September 16, 1992, and that the notice of appeal filed March 12, 1993, is not timely. The plaintiffs contend that, although the District Court issued an order on March 10, 1993, that order simply determined that the BOCC had not complied with the "final" judgment of the District Court entered on September 16, 1992.

Rule 5(a)(1), M.R.App.P., requires that, when the appellant is a political subdivision of the state, the notice of appeal must be filed within sixty days from the entry of the judgment or from the service of notice of entry of judgment. We have previously held that the time for filing an appeal does not begin to run until the prevailing party serves a notice of entry of judgment. In re Marriage of Robertson (1989), 237 Mont. 406, 411, 773 P.2d 1213, 1217. If the prevailing party does not serve a notice of entry of judgment, the time for appeal never begins to run. See Robertson, 773 P.2d at 1217.

In this case, the plaintiffs never served a notice of entry of judgment on the BOCC, either for the September 16, 1992, order, which the plaintiffs contend is the "final" judgment in this case, or for the March 10, 1993, order. Therefore, because no notice of entry of judgment was filed and served, the sixty-day appeal time never began to run on either order. Thus, the BOCC's appeal was timely, and we need not address the issue of whether the September 16, 1992, order or the March 10, 1993, order was the "final" judgment in this case.

II - STATUTORY PROCEDURES

The BOCC contends that, contrary to the District Court's conclusion, it followed the correct statutory procedures when it created the CGRID. We agree.

Sections 7-12-2101, et seq., MCA, provide the statutory framework by which a county may create a rural improvement district. This statutory scheme provides a nine-step process which

8

requires notice and the opportunity to be heard. We will address each step in turn.

A. RESOLUTION OF INTENTION

The first step in the statutory process of creating a rural improvement district requires a resolution of intention. Section 7-12-2103, MCA, provides, in pertinent part:

(1) Before creating any special improvement district for the purpose of making any of the improvements or acquiring any private property for any purpose authorized by this part, the board of county commissioners shall pass a resolution of intention to do so.

(2) The resolution shall:

(a) designate the number of such district:
(b) describe the boundaries thereof:
(c) state therein the general character of the improvements which are to be made:
(d) designate the name of the engineer who is to have charge of the work and an approximate estimate of the cost thereof: and
(e) specify the method or methods by which the costs of the improvements will be assessed against property in the district. . . .

"The resolution of intention is the primary step to be taken in every [proposed creation of a rural improvement district]. It is the basis of the whole proceeding." Billings Bench Water Ass'n v. Yellowstone County (1924), 70 Mont. 401, 408, 225 P. 996, 999. In this case, the BOCC adopted Resolution of Intention No. 1992-51 at a public hearing on April 28, 1992. The plaintiffs have not challenged the contents or the adoption of the resolution of intention.

B. NOTICE OF RESOLUTION OF INTENTION

After the resolution of intention is passed, notice of that resolution must be given. Section 7-12-2105, MCA, provides, in pertinent part:

(1) Upon having passed the resolution of intention pursuant to 7-12-2103, the board of county commissioners must publish notice of the passage of such resolution of intention as provided in 7-12-2121.

(2) The board shall also cause a copy of such notice to be posted in three public places within the boundaries of such special improvement district. A copy of such notice shall be mailed as provided in 7-1-2122 to every person . . . owning real property within the proposed district listed in his name upon the last completed assessment roll for state, county, and school district taxes.

In addition, subsection (3) of § 7-12-2105, MCA, lists a number of specific details which must be provided in the notice.

Compliance with the notice requirement is essential, as the failure to give notice of the intention to create a rural improvement district deprives the county of jurisdiction to proceed. Billinas Bench Water Ass'n, 225 P. at 999. In this case, the BOCC published, posted, and mailed notice to all the landowners in the proposed district, and its actions complied with the statute. All landowners were given notice and, in fact, none of the plaintiffs have contended that the required notice was not given. Therefore, the BOCC met this statutory requirement.

C.    RIGHT TO PROTEST CREATION OF DISTRICT

After notice of the intent to create the resolution is given, the affected landowners must be given the opportunity to protest the creation of the district. Section 7-12-2109, MCA, provides, in pertinent part:

At any time within 15 days after the date of the first

10

publication of the notice of the passage of the resolution of intention, any owner of property liable to be assessed for said work may make written protest against the proposed work or against the extending or creation of the district to be assessed, or both. Such protest must be in writing, identify the property in the district owned by the protestor, and be signed by all owners of the property. . . .

Here, the BOCC mailed the Notice of Resolution of Intent and public Hearing on April 30, 1992. This notice contained the following language:

Any owner of property within the proposed district may make protest against the creation of the district. Such protest must be in writing, identify the property in the proposed district by legal description or PIN number, and be signed by all owners of the property. <u>Protests must be deliveredtothe County Treasurer/Clerk and Recorder's Office no later than 5:00 p.m., on Monday, May 18. 1992.</u> . . .

This notice contained all the statutory requirements and gave the affected landowners the opportunity to protest the creation of the CGRID. Again, the plaintiffs have not alleged that they were not given the statutory fifteen days to file written protests. The BOCC complied with the third step in the statutory process.

D.  HEARING ON PROTESTS

After all written protests have been filed, a hearing on those protests must be held. Section 7-12-2111, MCA, provides, in pertinent part:

(1) At the next regular meeting of the board of county commissioners after the expiration of time within which protest may be made, the board shall proceed to hear and pass upon all protests so made, and its decision shall be final and conclusive. The board may adjourn said hearing from time to time.

The importance of hearing and passing on the protests is illustrated by § 7-12-2112, MCA, which provides, in pertinent part:

11

> (1) Except as provided in subsection (2), no further proceedings shall be taken for a period of 6 months from the date when said protest was received by the county clerk when the board of county commissioners finds that such protest is made by the owners of property in the district to be assessed for more than 50% of the cost of the proposed work, in accordance with the method or methods of assessment described in the resolution of intention.

Pursuant to this statute, the affected landowners can "block" the proposed district, for a period of six months, by filing an adequate amount of protests.

On May 19, 1992, the BOCC held a public hearing to determine the validity of the protests which had been filed by affected landowners. At that time, staff members informed the BOCC that more time was required to research the validity of certain protests. The hearing was then publicly adjourned and continued to May 26, 1992. At the May 26 hearing, staff members again requested additional time, and the BOCC again publicly adjourned and continued the hearing until May 28, 1992.

One of the primary issues raised by the county staff at the May 28 hearing was that of ownership. The BOCC was required to determine ownership of each affected parcel to determine the validity of certain protests and to ascertain if the proper owners registered a protest.

Section 7-12-2110, MCA, defines "owner" as the person owning the fee, the person with legal title, or the person in possession of the land. Section 7-12-2105, MCA, requires that the names of the owners of the affected land be taken from the last completed assessment roll for state, county, and school district taxes.

12

Based on these statutes, and on § 7-12-2109, MCA, which requires that the written protest be signed by all owners of the property, the BOCC required that all owners listed on the assessment roll sign the written protest. If that was not done, the BOCC rejected the protest.

For example, Laughing Water signed a written protest on three parcels owned jointly by him and India Supera. However, Ms. Supera was out of the country and did not sign the protest. Mr. Water attempted to file a protest and signed Ms. Supera's name by power of attorney. However, it was discovered that Mr. Water had no written power of attorney from Ms. Supera. To have any legal authority, a power of attorney must be given pursuant to a written instrument. See §§ 70-15-304 and 72-5-501, WCA. In this case, Mr. Water presented no written power of attorney, and the BOCC properly concluded that the protest filed by Mr. Water must be rejected, because all owners did not sign the protest as required by § 7-12-2109, MCA. Bob Scow also filed a protest by power of attorney on behalf of Mohammad Iianif, which was accepted by the BOCC, because Mr. Scow presented a written power of attorney.

The BOCC rejected the protest of Don Lais on two parcels, because the county assessment records revealed that the two parcels were owned by Don Lais and Luanna Cowen. Because Ms. Cowen did not sign the protest, it was rejected. At the District Court hearing on August 11, 1992, the plaintiffs admitted a quit claim deed from Ms. Cowen to Mr. Lais, and the protest was subsequently accepted.

In addition, the BOCC allowed two landowners, who had filed

13

written protests prior to the Way 18, 1992, deadline, to rescind the protests after that deadline. Leah Tursich filed a written protest: however, it was not signed by the other owner of the parcel, Joe Tursich. Both parties signed the rescission. In addition, Dorothy Carrico signed a protest and then rescinded the same. We note that, based on the analysis above, Ms. Tursich's protest was not valid in any case, because all owners of the property had not signed the protest. Therefore, whether the BOCC properly accepted her rescission is moot. However, we must address whether the BOCC properly accepted the rescission of Ms. Carrico.

We have not previously ruled on whether a board can accept a rescission under its discretionary authority "to hear and pass upon all protests." Section 7-12-2111, MCA. However, we have previously ruled on a similar issue in Ford v. Mitchell (1936), 103 Mont. 99, 61 P.2d 815. In Ford, the plaintiff sought to restrain the Secretary of State from certifying an initiative. In discussing the withdrawal of names from the initiative petition, we stated that "any person signing the petition has an absolute right to withdraw his name at any time before the person or body created by law to determine the matter submitted by the petition has finally acted." Ford, 61 P.2d at 822. We apply this reasoning to the case at hand, and hold that a landowner has the right to withdraw his or her protest prior to the time the board holds the hearing to pass on the protests. Therefore, when Ms. Carrico rescinded her written protest prior to the May 19, 1992, hearing, her rescission was valid and the BOCC properly accepted the same.

14

After the BOCC heard and passed on all the protests, the total protest vote on May 28, 1992, totaled 44.5% of the eligible property values. We note that, notwithstanding, had the BOCC accepted every written protest which was filed, including those of Mr. Water, Ms. Supera, and Mr. Lais, and rescinded those who no longer wished to protest, including Ms. Tursich and Ms. Carrico, the total amount of protests would have been 48.65%, which was not enough, under § 7-12-2112, MCA, to prevent the BOCC from proceeding to create the CGRID.

The plaintiffs have made issue of the fact that the BOCC adjourned the Way 19, 1992, meeting until Way 26, 1992, and then again until Way 28, 1992. However, we note that § 7-12-2111, MCA, specifically states that the "board may adjourn said hearing from time to time." In this case, the adjournment of the hearing was necessary to allow the staff to adequately research and prepare responses to certain protests. The BOCC adjourned each hearing with a specific time and place given for continuation of the hearing, and was authorized to do so under § 7-12-2111, MCA. We hold that the BOCC complied with the statutory requirements for holding a public hearing to pass on the protests.

E. RESOLUTION CREATING DISTRICT

If, pursuant to § 7-12-2112, MCA, the proposed district is not "blocked" by the affected landowners, the board has the power to create the proposed district. Section 7-12-2113, MCA, provides, in pertinent part:

> (1) Before ordering any of the proposed improvements, the board of county commissioners shall pass a resolution

15

creating the special improvement district in accordance with the resolution of intention theretofore introduced and passed by the board.

In this case, the affected landowners did not present sufficient valid protests to prohibit the BOCC from passing a resolution creating the CGRID and the BOCC, within its authority, passed Resolution No. 1992-65 on Way 28, 1992, in compliance with statutory requirements.

F.   RESOLUTION FOR LEW AND ASSESSMENT OF TAX

After the board passes the resolution which creates the rural improvement district, it must pass a resolution to levy and assess a tax against the affected landowners.   Section 7-12-2158, MCA, provides, in pertinent part:

(1) To defray the cost of making or acquiring improvements in any special improvement district, the board of county commissioners shall by resolution levy and assess a tax upon all benefited property in the district created for such purpose, by using for a basis for such assessment the method or methods provided for by this part and described in the resolution of intention.

The statute further provides a list of particulars the resolution must contain.   In this case, the BOCC adopted a resolution to levy and assess taxes on August 18, 1992.   The resolution adopted by the BOCC complied with the statutory requirements, and the plaintiffs have not alleged otherwise.

G.   NOTICE OF RESOLUTION FOR LEW AND ASSESSMENT OF TAX

After adopting the resolution for levy and assessment of taxes, the board must give notice of that resolution.   Section 7-12-2159, MCA, provides, in pertinent part:

(1) A notice, signed by the county clerk and stating that the resolution levying a special assessment to defray the

16

cost of making the improvements is on file in the office of the county clerk and is subject to inspection, shall be:

    (a) published as provided in 7-1-2121;
    (b) mailed to the owner of each lot, tract, or parcel of land to be assessed . . .; and
    (c) mailed to such other persons known to the clerk to have an ownership interest in the property.

In addition, the notice must state the time and place in which objections to the final adoption of the resolution will be heard by the board. Section 7-12-2159(2), MCA.

In this case, legal notice was mailed on August 20, 1992, and published as required by statute on August 21 and 28, 1992. Again, the plaintiffs have not alleged that proper notice of the resolution for levy and assessment of taxes was not given, and we hold that the BOCC complied with the seventh step in the process of creating a rural improvement district.

H. HEARING ON PROTEST

After notice of the resolution for levy and assessment of taxes is given, the board must "meet and hear all such objections" as the affected landowners may present. Section 7-12-2160, MCA. In this case, the BOCC held a hearing on September 3, 1992, in which it heard all objections, both regarding the assessment and the CGRID process itself. By holding the hearing, the BOCC satisfied its statutory requirement. The BOCC chose not to reconsider the adoption of the CGRID, and it was not required to do so under the statutory scheme enacted by the legislature.

I. DELIVERY OF RESOLUTION

17

The last requirement in the creation of a rural improvement district mandates that the final resolution creating the rural improvement district be delivered to the county treasurer within two days after its passage. Section 7-12-2160(2), MCA. Here, the BOCC properly forwarded the resolution to the treasurer for assessment purposes, and the plaintiffs have not challenged the BOCC's compliance with this final statutory step.

In summary, after reviewing each and every one of the nine statutory steps required to complete the process of creating a rural improvement district, we conclude that the BOCC complied with each of these requirements.

### III — FAILURE TO HOLD ADEQUATE PUBLIC HEARINC

The District Court held that the BOCC failed to hold adequate public hearings when it created the CGRID. We disagree.

In its March 10, 1993, order, the District Court stated that the plaintiffs had been denied their constitutional and statutory rights of a fair hearing and public participation, as no public comment or participation was solicited at the May 26, 1992, or May 28, 1992, hearings. As stated above, § 7-12-2111, MCA, allows the board to adjourn these hearings. Based on our discussion above, it is clear that the BOCC followed each and every step in the nine-step statutory process when it created the CGRID. The legislature has designed the process a board of county commissioners must follow to create a rural improvement district. Whether or not the opportunity for more public participation should be given is a matter left to the discretion of the legislature. Given the

18

statutory requirements now in place, we hold that the BOCC's hearings complied with those mandates. The District Court erred in concluding that the BOCC failed to comply with the statutes and in requiring the BOCC to delete or refund the CGRID assessments and to re-notice the hearings and provide further opportunity to participate.

Reversed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

19